**CHURCH OF THE CHOSEN PEOPLE (NORTH AMERICAN PANARCHATE) Also Known as Demigod Socko Pantheon, Plaintiff,**

**v.**

**The UNITED STATES of America, Defendant.**

**No. Civ. 4–81–311.**

United States District Court, D. Minnesota, Fourth Division.

Oct. 18, 1982.

---

Lynn M. Roberson, Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., for plaintiff.

Mary Frances Clark, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER INCORPORATING FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

MacLAUGHLIN, District Judge.

This is an action by plaintiff Church of the Chosen People (North American Panarchate) also known as Demigod Socko Pantheon for the refund of federal income taxes paid for the years 1976, 1977, and 1978.[1] The plaintiff seeks a refund in the amount of $472 on the basis that the plaintiff qualified as a tax exempt organization under section 501(c)(3) of the Internal Revenue Code of 1954, 26 U.S.C. § 501(c)(3). The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(a)(1), which provides for a de novo determination of the exemption issue. A trial before the Court was held on August 16 and 17, 1982. This memorandum constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

FACTS

■ Plaintiff Demigod Socko Pantheon (DSP) was incorporated in Minnesota on August 31, 1976. DSP filed federal income tax returns for tax years 1976, 1977, and 1978, and paid taxes in the amounts of $45.60, $1.40, and $425.00 for the respective years. In April, 1979, DSP filed a claim for refund for each of the three years on the basis that it was a tax exempt organization. The Internal Revenue Service (IRS) never issued a formal disallowance of these refund requests. The plaintiff commenced this suit on June 10, 1981. More than six months have elapsed since the filing of the refund requests. Thus, the Court has jurisdiction.[2] See Tate v. Knox, 131 F.Supp. 514, 516 (D.Minn.1955).

---

1. The Church of the Chosen People (CCP) was incorporated in Minnesota on June 6, 1975. The parties stipulated that because both CCP and Demigod Socko Pantheon (DSP) shared the same purposes, administrators, facilities, and activities for the years at issue, they were in fact the same organization. Therefore, any reference to "DSP" or "plaintiff" includes CCP.

2. The refund filing requirements that are prerequisites to suit in United States District Court

The plaintiff's articles of incorporation contain a list of several of the organization's purposes.[3] According to Richard

are set forth in 26 U.S.C. § 6532, which provides in part as follows:

> (1) *General rule.—No suit or proceeding* ... for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary or his delegate renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary or his delegate to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates.

Although the IRS never ruled on the plaintiff's refund requests, the IRS denied the plaintiff's three applications for tax exempt status as a religious organization. The plaintiff first applied for tax exempt status as a religious organization pursuant to section 501(c)(3) on August 1, 1975. *See* Exhibit 1. After the plaintiff submitted additional information, the IRS denied its application on November 21, 1975. The IRS gave the following reasons for its denial:

> Since you have not provided information regarding your religious services and traditions and the financial information as to how you will accomplish your purposes, we are unable to rule at this time as to whether you qualify for recognition of exemption under section 501(c)(3).

Exhibit 4 at 1.

The plaintiff filed a second application for tax exempt status and submitted additional information to the IRS on August 23, 1976. *See* Exhibit 5. After the plaintiff submitted further information, the IRS denied its second application on April 22, 1977. The denial was based on the ground that the plaintiff had "refused to submit substantial and specific information about your tenets, traditions, practices, and activities that is needed in order to [make a determination]." Exhibit 11 at 1.

The plaintiff applied for tax exempt status a third and final time on December 1, 1977. *See* Exhibit 12. After the plaintiff submitted additional information, the IRS denied its third application on December 7, 1978. The denial was based on the grounds that the plaintiff was "not organized or operated exclusively for religious or other charitable purposes within the meaning of section 501(c)(3)" and that the plaintiff was "organized and operated for private rather than public interest." Exhibit 24 at 1.

**3.** The articles of incorporation state in part as follows:

> The general purpose of this body corporate shall be that of a Plenary religious associa-

John Baker (Baker), an attorney for and Archon of the DSP,[4] the plaintiff's primary purpose and activity is the preaching of a

tion; more specifically, to promote the doctrine of the Church of the Chosen People; to preach THE GAY IMPERATIVE to the Chosen and breeder alike, and promulgate a Pagan doctrine of social mores and restored precepts of creation, religion and evolution; to promote the founding of local Churches of the Chosen People, and adjudicate Canons for them; to establish such foundations, associations, or religious groups, shrines, heros, parsonages, and missionary and eleemosynary groups as may be necessary and meet, provided that this body corporate will not, as a substantial part of its activities, attempt to influence legislation or participate to any extent in a political campaign for or against any candidate for public office; to hold, incept, *sponsor and promote such meetings, conven-*tions, rites and sacrifices as may be required; to elect, promote or appoint the true terrestrial hierarchy of the aforesaid Church of the Chosen People; to take charge of and manage, or cause to be managed, all temporal affairs of the aforesaid Church unto the said Panarchate belonging or in any wise appertaining, to the benefit of said Church in said Panarchate; to promote the spiritual, educational, and other interests of the said Church in said Panarchate, and to establish academies and schools or religion therein, and also to establish and conduct said colleges, academies, and schools of religion and all other work of the said Church in said Panarchate; to ordain or cause to be ordained the only true proselytes, Archons, demi-Gods and demi-Goddesses and other functionaries of the said Church; to take charge of, hold and manage, or cause to be managed, all property, real or personal, that may at any time come to or vest in this body corporate for any purpose whatsoever for the use and benefit of said Panarchate and for the use and benefit of the aforesaid Church of the Chosen People therein, whether by purchase, gift, grant, devise, bequest or otherwise, and to mortgage the same, sell or otherwise dispose of it as the necessities or best interests of said body corporate, said Church, and said Panarchate, in the opinions of the members with suffrage thereof may require; and to promote and diligently work toward the promotion of TRUTH, JUSTICE, AND THE NEW AMERICAN WAY.

Exhibit 1, Attachment 5 at 2.

**4.** An Archon is "[t]he ethical governor of a Pantheon," which is a sanctuary or sacred place. *See* Exhibit 3, Attachment 2 at 3. According to the plaintiff's articles of incorporation, the DSP is governed by a board, called the Board of the People, which is composed of

doctrine called The Gay Imperative. The plaintiff defines The Gay Imperative as "[t]he philosophic fundamental whereby the Gods direct that ever increasing numbers of persons expand their affectional preferences to encompass loving Gay relationships to hasten their full development for the control of overbreeding, and to ensure the survival of the human species and the multitude of terrestrial ecologies." Exhibit 14, Attachment 1 at 1. Baker testified that "gay relationships" are positive, self-fulfilling emotional and physical bonds between two members of the same gender. Although Baker stressed the importance of the emotional bond, he stated that such relationships include physical relationships. A major goal of the doctrine is the control of "overbreeding" or population growth.

At trial Baker testified[5] that The Gay Imperative includes the belief that there are three equally valid human pair-bonds: male-male, female-female, and male-female. According to Baker, each can be viewed as a leg of a triangle; all are necessary to the species. Baker stated that religions that the IRS views as mainstream promulgate doctrines that state only male-female relationships are valid in the eyes of God and that other relationships are perversions. In contrast, DSP promulgates doctrines affirming the validity of male-male bonds. Adherents to The Gay Imperative believe that only 10 percent of the population has to reproduce in order to be self-fulfilled; another 10 percent of the population needs a female-female bond for self-fulfillment; and another 10 percent of the population needs a male-male bond for self-fulfillment. According to this doctrine, the remaining 70 percent of the population can be persuaded to join religions advocating any of the three pair-bonds. Baker testified that individuals have a duty to develop "viewpoints" and "ideologies" to counterbalance mainstream or traditional religions. An often-stated goal of the plaintiff is the conversion of "breeders" to the plaintiff's beliefs and espoused lifestyle. *See, e.g.,* Exhibit 5, Attachment 2 at 2.

The plaintiff's organization or structure is pyramidal. Archons occupy the highest governing positions in the DSP. Only Archons can be elected to serve in the corporate positions of president and secretary, but only members who are not Archons can be elected to serve as vice president and treasurer.[6] According to Baker, Archons are divinely appointed and are not required to complete any formal training. During the period from 1975 to 1978, four individuals were Archons. Baker and J. Michael McConnell (McConnell) are the only Archons presently active in the DSP. Both testified at trial.[7] The plaintiff's organizational structure includes other functionaries known as proselytes, demigods, and heroes. Baker testified that during the period at issue he was not sure whether anyone served as a functionary. Baker stated that one person may have served as a proselyte and another person may have served as a demigod. Functionaries, like the members and officials, are only required to take one vow, which is to preach The Gay Imperative to the "Chosen" and "breeders" alike.[8]

---

three to five Archons, who are divinely appointed, and up to five members, who are appointed by the Archons. The Archons elect one of their number to serve as the Prime Archon and the chairperson of the board. *See* Exhibit 1, Attachment 5 at 2.

**5.** A portion of the testimony of Baker, in which he describes The Gay Imperative in some detail, is attached hereto as Exhibit A and made a part of this memorandum opinion.

**6.** *See* Exhibit 1, Attachment 5 at 3.

**7.** Baker testified that he and J. Michael McConnell are married to one another.

**8.** The plaintiff defines "Chosen" as a person "befavored by the Gods, especially members of the Church of the Chosen People (usually not applied to breeders) ...." Exhibit 3, Attachment 2 at 5. Baker testified that the "Chosen" are the adherents of The Gay Imperative, and "breeders" are people who feel unfulfilled unless they produce a child or "carbon-copy," the term used by Baker, of themselves.

In addition to officers and functionaries, the plaintiff has members.[9] The plaintiff presented conflicting evidence concerning the number of its members. In a letter to the IRS dated October 27, 1975, the plaintiff claimed to have 10 members. *See* Exhibit 3, Attachment 1 at 10. However, Baker testified that the plaintiff had no list of the members of the congregation. Baker also stated that the secretary of the DSP had not enrolled any members during the period at issue.

In addition to members, the plaintiff has, according to Baker, adherents who "identify" with the DSP and The Gay Imperative. The plaintiff maintains no record of the names or numbers of these adherents. Adherents are not required to attend any ceremonies, to participate in any instruction, or to read any publications. According to Baker, adherents are automatically trained by associating with members of the DSP.

The plaintiff possesses no outward characteristics that are analogous to those of other religions. The plaintiff has no published literature explaining its traditions. The plaintiff's doctrines are not formalized in any written equivalent of the Bible, Talmud, Koran, or Bhagavadgita. Nor does the plaintiff claim to have any oral literature reflecting its beliefs or history. During the years in question, the plaintiff conducted only two ceremonies. One of the ceremonies was a memorial to a gay victim; the other was the dedication of an archacy or subunit of the geographic area known as a Panarchate. The plaintiff held no regular religious services although it declared certain parts of an annual Gay Pride Week a "Festival of the Chosen." The plaintiff claims to have performed one marriage between two members of the same sex. The Minnesota Supreme Court has declared that such same sex "marriages" are not authorized and are in fact prohibited under Minnesota statutes. *Baker v. Nelson*, 291 Minn. 310, 191 N.W.2d 185, 186 (1971).

The plaintiff itself emphasizes the secular nature of its ideology. The plaintiff's sacerdotal functions are "[a]ll bodily functions normal to the adult human ..." Exhibit 3, Attachment 1 at 7. The plaintiff's secular nature is also revealed in its advertising. For example, the following advertisement appeared in the *Minneapolis Tribune* on June 18, 1977:

The Chosen. Dedicated, strong, growing. Religious explorations and *a secular lifestyle* for men and women who won't worship a god who oppresses Gays.

The Chosen preach The Gay Imperative, *proselytizing Gay affections as a healthy and fulfilling personal option.* We sanctify unions, commune sacramentally, deprogram guilts and inadequacies left over from repressive religious training, and have an active Youth Ministry. We fully expect our members to change the world.

Gay Pride Week is a traditional Festival of the Chosen, and this year our observances are expressly dedicated by the Archons as a Memorial to the Gay Victim. Join us in the Parade .... and maybe you'll discover you've been Chosen all along.

Exhibit 12 at 16 (emphasis added). Baker testified that the main activity of the plaintiff's adherents is preaching The Gay Imperative which can be done anywhere on the planet and encompasses all of daily life. This "preaching," according to Baker, involves attaining a state of consciousness that can be exhibited anywhere including walking down the street or at poker games. No words are required to "preach" the doctrine.

No clear distinction existed between the plaintiff's business affairs and those of Baker and McConnell. The plaintiff's income from donations and the sale of religious artifacts was used to pay the rent at 2929 South 40th Street, Minneapolis, Minnesota, in 1977. Baker and McConnell used the residence as their personal residence

---

**9.** *See* Exhibit 3, Attachment 2 at 14. Members are defined in the plaintiff's Canon of Incorporation, as those who "register with a duly appointed Secretary of the body corporate his or her full name and mailing address." Members have no right to vote on issues; only the Board of People can vote. Exhibit 1, Attachment 5 at 2.

and only one room was occasionally used for church administrative matters. On a few occasions the residence was used for social gatherings by the plaintiff's adherents. The rent was not prorated to reflect a division between personal and church use. The plaintiff's revenues also were used to pay the utilities and telephone bills for the residence. In addition, the plaintiff paid for subscriptions to *Time* magazine, local newspapers, and other periodicals in Baker's and McConnell's names. The plaintiff's bank account was in Baker's name, not its own name.

## DISCUSSION

■ The issue before the Court is whether the plaintiff is entitled to a refund for the years in question because it satisfied the requirements for a tax exempt organization, pursuant to section 501(c)(3) of the Internal Revenue Code of 1954 (I.R.C.), 26 U.S.C. § 501(c)(3).[10] An organization qualifies for an exemption under this statute only if it is both "organized and operated exclusively for religious . . . purposes. . . ." In addition, the statute also requires that no part of the corporation's net earnings benefit any private shareholder or individual and that the corporation not engage in prohibited political activity. The burden is on the plaintiff to establish that it qualifies for the exemption. *First Libertarian Church v. Commissioner,* ¶ 74.27 P–H TC 216, 220 (1980); *Parker v. C.I.R.,* 365 F.2d 792, 799 (8th Cir. 1966), *cert. denied,* 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967). Tax exemptions are a matter of legislative grace, and thus, plaintiff must establish that it is entitled to exemption. *Dickinson v. U.S.,* 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953).

■ In determining whether the plaintiff is entitled to an exemption, the Court must avoid any judgments concerning the truth or validity of the plaintiff's religious beliefs. In *Teterud v. Burns,* 522 F.2d 357 (8th Cir. 1975), the United States Court of Appeals for the Eighth Circuit emphasized the first amendment's ban on such inquiries: "It is not the province of government officials or court to determine religious orthodoxy." 522 F.2d at 360 (citations omitted). *See also U.S. v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965) ("while the 'truth' of a belief is not open to question, there remains the significant question whether [the belief] is 'truly held.' ").

■ Even if the Court determines that the plaintiff organization and its adherents are sincere in their beliefs, they must still establish that their beliefs are religious in nature. The definitions of the words "religion" and "religious" are by no means free of ambiguity. *See Washington Ethical Society v. District of Columbia,* 249 F.2d 127, 129 (D.C.Cir.1957). *See also Malnak v. Yogi,* 592 F.2d 197 (3d Cir. 1979) (definition of religion in first amendment cases). The United States Supreme Court has not established a clear standard for determining which beliefs are religious. The Supreme Court has, however, distinguished between personal secular philosophy and religious beliefs. *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 216, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) (distinguishing between the religious belief of the Amish and personal philosophy of Thoreau).

In *Africa v. Commonwealth of Pennsylvania,* 662 F.2d 1025 (3d Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982), the court set forth a three-part

---

**10.** Section 501(c)(3) provides in part as follows:

(a) Exemption from taxation.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

. . . .

(c) List of exempt organizations.—The following organizations are referred to in subsection (a):

. . . .

(3) Corporations . . . organized and operated exclusively for religious . . . purposes . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation . . . and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

test for determining whether a plaintiff's goals are religious. The test addresses the questions of: (1) whether the beliefs address fundamental and ultimate questions concerning the human condition, (2) whether the beliefs are comprehensive in nature and constitute an entire system of belief instead of merely an isolated teaching, and (3) whether the beliefs are manifested in external forms. 662 F.2d at 1032. Many courts use a definition by analogy approach, inquiring whether the beliefs espoused hold "the same important position for members of one of the new religions as the traditional faith holds for more orthodox believers . . . ." *Malnak v. Yogi*, 592 F.2d 197, 207 (3d Cir. 1979).

■ Section 501(c)(3) states that an exempt organization must be organized and operated exclusively for religious purposes. Courts have, however, interpreted the word "exclusively" to mean "substantially." If an organization engages in substantial political activity, in contrast to religious activity, the organization is denied tax exempt status even if the political activity is religiously motivated. *Contracting Plumbers Cooperative Restoration Corp. v. U.S.*, 488 F.2d 684 (2d Cir. 1973), *cert. denied*, 419 U.S. 827, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); *Christian Echoes National Ministry, Inc. v. U.S.*, 470 F.2d 849 (10th Cir. 1972), *cert. denied*, 414 U.S. 864, 94 S.Ct. 41, 38 L.Ed.2d 84 (1973). The plaintiff argues that the Court should merely accept the plaintiff's own assessment that its purposes were religious in nature. However, as the defendant aptly states, the Court is not bound by the plaintiff's assertions. *Christian Echoes National Ministry, Inc. v. U.S.*, 470 F.2d 849, 856 (10th Cir. 1972).

■ The Court concludes based on its findings of fact and the standard set forth in *Africa* that the plaintiff was not exclusively or substantially organized for religious purposes. During the period in question, The Gay Imperative, the plaintiff's only major doctrine, was a single-faceted doctrine of sexual preference and secular lifestyle. The plaintiff's ideology did not address the fundamental and ultimate questions concerning the human condition, such as the nature of good and evil, right and wrong, life and death.

The plaintiff's doctrine was not comprehensive in nature nor did it constitute an entire system of belief. Instead, the plaintiff narrowly focused on only one aspect of human existence—sexual preference. Despite the construction of an elaborate framework based on numerous borrowings from ancient Greek philosophy, the plaintiff's entire structure rested on the slim foundation of one teaching.

In addition, the plaintiff lacked external manifestations analogous to other religions during the period in question. It possessed no established history or literature, required no formal or informal education of its leaders, conducted no regular ceremonies, and possessed no identifiable membership beyond its small core of leaders. The plaintiff is prohibited by Minnesota law from conducting same-sex "marriages," one of the few activities the plaintiff performed that is analogous to those of mainstream religions.

■ The Court also concludes that the plaintiff was operated to benefit private individuals and thus, was not qualified for exemption on this basis. The entire rent for Baker and McConnell's residence was paid by the plaintiff even though the residence was not used substantially for religious purposes. The plaintiff's revenues provided other substantial personal benefits to Baker and McConnell that were unrelated to religious purposes. *See Founding Church of Scientology v. U.S.*, 412 F.2d 1197, 1199–1200 (Ct.Cl.1969).

The Court concludes that because the plaintiff was not organized and operated exclusively for religious purposes, the plaintiff was not entitled to tax exempt status under section 501(c)(3).

ACCORDINGLY, IT IS ORDERED that the plaintiff's request for a tax refund for the years 1976, 1977, and 1978, is hereby denied.

FURTHER, IT IS ORDERED that judgment shall be entered in favor of the defendant United States of America.

LET JUDGMENT BE ENTERED ACCORDINGLY.

EXHIBIT A

\* \* \*

RICHARD JOHN BAKER,

called as a witness by plaintiff, being first duly sworn, testified as follows:

\* \* \*

THE COURT: Could you define for me the Gay Imperative again?

THE WITNESS: I can do it best, Your Honor, by going to the blackboard, if that would be okay.

THE COURT: All right.

(Witness at the blackboard.)

THE WITNESS: Your Honor, the chosen belief is that the species comes in two genders. That begets three equally valid pair bondings. That can be best represented by a triangle, and at one leg of the triangle we have male-male bonds or relationships, at another leg of the triangle there are female-female relationships, and at the third leg of the triangle there are male-female, or both genders. Out of each triangle then this represents the human species, and that each leg of the triangle is a necessary and concomitant part of the species.

Religions which counsel for the Agency describes as mainstream religions, are generally operating at this leg of the triangle and they promulgate doctrines that say that only those relationships which can reproduce the species are legitimate in the eyes of God, or one or more gods. And that those relationships which cannot or choose not to reproduce are generally described as perversion.

On another leg of the triangle we have religions that primarily speak to relationships between persons of the male gender or, on another leg, relationships between persons of the female gender; but, in any case, these are relationships or bondings between persons of the species of the same gender.

The Church of the Chosen People is primarily operating at this leg of the triangle.

THE COURT: "This leg of the triangle" being male-male relationships?

THE WITNESS: Male-male relationships, Your Honor. It does not exclude the involvement of females. It just simply means that it's a religion that affirms the rightness and the positiveness of bondings between persons of the same gender, who happen in most cases to be male.

Now, what counsel for the Agency is attempting to do is to say that because the Church of the Chosen People is a religion promulgating doctrines from this leg of the triangle it is making a mockery of religions that are operating from this leg of the triangle identified by B on the blackboard, and that—

MS. CLARK: Your Honor, excuse me. I would just like to say that there has been no testimony by the Agency or counsel for the Agency about a mockery of any religions or anything else. I think what we have here is argument rather than testimony.

THE WITNESS: Your Honor, she is correct, but it appears in her memorandum. And I would simply point out that by analogy if we had a bowl of fruit that had bananas and apples and oranges, to select a banana is not to reject an apple, although one could characterize it in that vein if one were predisposed to be negative in one's description.

Now, in terms of the species, those who are operating from this leg of the triangle identified by B and propagating, there is more than enough members of the species who will propagate no matter what to continue the species ad infinitum. It is not necessary, according to the doctrine of the Church, that every single woman produce one child or two children or three. It is not necessary that everyone breed or reproduce.

Then we are talking generally about those who have to reproduce or breed. The number of the species that must do that in order to have self-fulfillment of their own individual person is and can be shown to be a relatively small number of those that

operate at this leg of the triangle. It can be a relatively small number. We are talking about less than 10 percent at either one. Which leaves about 70 percent of the population that can be persuaded to respond to the doctrines in one way, shape or fashion to religions at any one leg of the triangle; and that all three legs and religions from each of the legs are necessary in order to control the overbreeding of the planet and to maintain a synthesis or just simply a place on the planet that is acceptable to the species. And that when one religion is overemphasized, we simply approach the situation as it is appearing on the planet today, where there is simply breeding to the point where it is mindless breeding and that the species cannot do that indefinitely and the planet cannot accommodate that indefinitely.

So that there is not only a right, but a duty for viewpoints and ideologies to arise up to counter-balance the influence that has imposed itself upon this planet.