TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN





NO. 03-02-00066-CV




Carole Keeton Strayhorn, in her Official Capacity as Comptroller of

Public Accounts, Appellant


v.


Ethical Society of Austin, f/k/a Ethical Culture Fellowship of Austin, Appellee




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353D JUDICIAL DISTRICT

NO. 98-12853, HONORABLE PAUL DAVIS, JUDGE PRESIDING




 O P I N I O N



 The Ethical Society of Austin ("the Ethical Society"), a congregation of
individuals who meet regularly to practice a belief system known as "Ethical Culture," seeks tax-exempt status as a religious organization under the tax code. See Tex. Tax Code Ann. §§
171.058, 151.310(a)(1), 156.012 (West 2002). The Texas Comptroller denied the application on
the ground that the Ethical Society must demonstrate that it requires belief in a "God, Gods, or
higher power" (hereinafter "the Supreme Being test") in order to qualify. The trial court found
that the Ethical Society should not have been denied tax-exempt status because the
Comptroller's test was unconstitutionally underinclusive and that the Ethical Society should
have qualified for the requested tax exemptions. We must now decide whether a state
government 

may, consistent with the First Amendment to the United States Constitution, require a group to
demonstrate its belief in a "Supreme Being" in order to be considered a religion for statutory
purposes. Because the Comptroller's test fails to include the whole range of belief systems that
may, in our diverse and pluralistic society, merit the First Amendment's protection, we will
affirm the trial court's judgment.


BACKGROUND

 In 1995, the Ethical Society, then known as the "Ethical Culture Fellowship of
Austin," organized the first ethical culture group in Texas. Society members characterize
themselves as "ethical humanists," sharing the unifying belief that "within the human experience
ethics is central." (1) In 1996, the Society applied with the Comptroller's Office for tax-exempt
status from sales, use, excise, hotel, and franchise taxes as a "religious" organization. See Tex.
Tax Code Ann. §§ 171.058, 151.310(a)(1), 156.012. 

 The Society filed a tax exemption application accompanied by detailed
information about its beliefs and activities. Initially, the Comptroller's office determined that
the Society did not qualify for tax-exempt status. However, after receiving additional
information the Comptroller's office set the application for a higher-level review. The Tax
Policy Group, which comprises the highest ranking officials in the Comptroller's office,
considered the entire application, including several citations to United States Supreme Court
decisions that seemed to indicate that the Society was, indeed, a religious organization. Based
on this record, Karey Barton, an official of the Comptroller's office, (2) sent a letter to the Society
indicating that it qualified for the requested tax exemptions.

 Shortly after the Society received the letter granting it tax-exempt status, the local
newspaper published a story detailing the determination made by the Comptroller's office. See
Ken Herman, Godless Group Gets Religious Exemption, Austin American-Statesman, June 26,
1997, at B1. Then-Comptroller John Sharp learned about the Tax Policy Group's determination
from the article. The Comptroller's office soon issued a "letter of correction," stating that the
original determination applied and that the Society was not a "religious organization" for
purposes of the tax code. Subsequently, the Comptroller confirmed that the Society did not
qualify for a tax exemption because it failed to meet the definition of "religion," which the
Comptroller construes to require worship of a Supreme Being for the purpose of interpreting the
administrative rules. (3) 

 The Ethical Society challenged the Comptroller's decision. Sitting without a jury,
the trial court determined that, by using its formulation of the "Supreme Being" test as the
primary basis for determining which organizations are "religious" for tax-exemption purposes,
the Comptroller had violated the First Amendment. (4) On appeal, the Comptroller contends that
the "Supreme Being" test creates a 

necessary bright-line rule protecting the state from being required to award tax exemption to any
group that calls itself "religious." Relying on language contained in the United States Supreme
Court's opinion in Wisconsin v. Yoder, 406 U.S. 205 (1972), the Comptroller asserts that its rule
is consistent with the principle that "religious" beliefs must be clearly delineated from "personal
or philosophical" beliefs. The Ethical Society, joined by various amici curiae, responds that the
Comptroller's test too narrowly defines the scope of religion. Relying on several United States
Supreme Court opinions that seem to include Ethical Culture within a group of religions, the
Ethical Society argues that the "Supreme Being" test, when applied as the sole determining
factor for granting tax exemptions, does not adequately account for the range of belief systems
which comprise the broad spectrum of religious faith in contemporary society. We agree with
the Ethical Society and will affirm.


DISCUSSION

The Supreme Being Test

 Because this dispute presents us with a constitutional issue, we review the trial
court's decision de novo. See, e.g., Perry v. Del Rio, 67 S.W.3d 85, 91 (Tex. 2001). Thus, we
owe no deference to the trial court's decision and may proceed to resolve the issues presented as
a matter of law. Quick v. City of Austin, 7 S.W.3d 109, 116 (Tex. 1998).

 The Legislature has provided that certain religious, educational, and charitable
groups are exempt from the franchise, sales and use, and hotel taxes. (5) See Tex. Tax Code Ann.
§§ 171.058, 151.310(a)(1), 156.012. The Comptroller's implementing administrative rules
require that a group be organized for the purpose of religious worship. (6) See 34 Tex. Admin.
Code §§ 3.161(a)(3), .322(a)(3), .541(c)(3) (2002). Because exempt status is not favored by
state law, any organization seeking a tax exemption has the burden to show, without doubt, that
it meets the applicable requirements and any doubt regarding the organization's qualifications
will result in denial of the exemption. See id. §§ 3.322(a)(1), (a)(2) (sales and use tax),
.541(a)(1) (franchise tax), .161(c) (hotel tax) (2002). The Comptroller assesses each application
according to a non-exclusive set of factors set out in internal agency documents, most of which
are objective factors, including whether the organization meets regularly for services, when and
where services are held, the approximate number of people attending services, and whether the
organization ordains clergy. In addition, the Comptroller has apparently made an informal
determination, applied in this case, that an organization must meet what we have called the
Supreme Being test, requiring belief in a "God, Gods, or higher power" in order to qualify for
tax-exempt status.

 This Supreme Being requirement does not appear in the tax code or the
administrative code. From the documents contained in the record, it appears that the Ethical
Society met all of the objective requirements contained within the Comptroller's internal
memorandum: among other things, it holds regular meetings, maintains a separate bank account
that profits no individual, and undertakes only activities having to do with its congregational
meetings. The Tax Policy Group, based on the Ethical Society's application, granted the
exemption. It appears, then, that the Comptroller's decision was based entirely on the
determination that Ethical Culture does not require belief in a Supreme Being.

 As a background matter, we recognize that the State may, consistent with the
Constitution, exempt religious groups from taxation. See Mueller v. Allen, 463 U.S. 388, 403
(1983); Walz v. Tax Comm'n of NewYork, 397 U.S. 664, 707-08 (1970). We also recognize that
the State has a compelling interest in insuring that only qualified religious organizations receive
the tax exemption--it cannot be sufficient for a group simply to label itself as a religion in order
to enjoy tax-exempt status. See, e.g., Church of the Chosen People v. United States, 548 F.
Supp. 1247, 1252-53 (D. Minn. 1982). However, this case involves a determination of whether
the Comptroller's Supreme Being litmus test is a valid means for determining whether the
Ethical Society is a religious group under the tax code.

 Although Texas courts have not addressed this issue, the slate on which we write
is not blank. Many courts and state administrative agencies have long determined that Ethical
Culture is a religion for the purpose of interpreting various government regulations. See, e.g.,
Washington Ethical Soc'y v. District of Columbia, 249 F.2d 127, 129 (D.C. Cir. 1957)
(interpreting Washington, D.C., property tax exemption); Society for Ethical Culture v. Spatt,
415 N.E.2d 449, 452 (N.Y. 1980) (Ethical Society held religious organization for purpose of
analyzing impact of architectural preservation law on its property); Murray v. Comptroller of the
Treasury, 216 A.2d 897, 901 (Md. 1965) (Maryland religious tax exemption constitutionally
sound in part because Ethical Culture considered tax-exempt); Fellowship of Humanity v. County
of Alameda, 315 P.2d 394, 410 (Cal. App. 1957) (interpreting California constitution to require
tax exemption for Ethical Culture under tax code); State of Illinois v. Ethical Humanist Soc'y, 95
ST 0257, *10 (December 14, 1995) (administrative decision of Illinois Department of Revenue
that Ethical Culture merited tax exemption). Although none of these determinations are based
explicitly on First Amendment grounds, they all represent the reasoned application of statutes in
light of contemporary cultural and religious values. This judicial history is persuasive in
suggesting that the Comptroller's test and decision are out of step with the general understanding
of the grant of tax exemptions to "religious" organizations in the United States.

 The Comptroller relies on the supreme court's declaration in Wisconsin v. Yoder
that a way of life, however virtuous and admirable, will not have First Amendment protection
unless it is rooted in "religious belief." 406 U.S. 405, 415 (1972). The Comptroller argues that
only its Supreme Being test adequately distinguishes between personal and religious beliefs. 
Furthermore, because the test encompasses the generic concept of a supernatural reality, the
Comptroller asserts that it is sufficiently broad to account for the various diverse religious views
existing in contemporary society. The Comptroller's argument rests on its understanding of the
development of the supreme court's interpretation of the First Amendment religious protections. 
Initially, the First Amendment was, indeed, understood to protect only those who believed in a
monotheistic deity. See Davis v. Beason, 133 U.S. 333, 342 (1890) ("The term 'religion' has
reference to one's views of his relations to his Creator, and to the obligations they impose of
reverence for his being and character, and of obedience to his will."). 

 However, in two more recent cases interpreting the federal conscientious objector
statute, United States v. Seeger, 380 U.S. 163 (1965), and Welsh v. United States, 398 U.S. 333
(1970), the Court adopted a broader definition of religion. The Universal Military Training and
Service Act exempted from military service persons "who by reason of their religious training
and belief are conscientiously opposed to participation in war in any form." See Seeger, 380
U.S. at 736. The statute defined religious belief as "belief in a relation to a Supreme Being
involving duties superior to those arising from any human relation." See id. at 741. In
interpreting the statute, the Seeger court carefully examined a number of religious and
philosophical viewpoints in order to avoid too narrow an analysis of individual belief. Id. at
746-47. Thus, in the context of interpreting a specific statutory provision, the Court saw fit to
interpret the term "religion" broadly in order to take into account the breadth of religious opinion
in American society. 

 According to the Comptroller, however, in Yoder the Court took a step back from
its position in Seeger and Welsh. Yoder involved an attempt by the state of Wisconsin to enforce
its mandatory schooling provisions, which required children to attend school until the age of
sixteen, against a group of Old Order Amish, who maintained that it would offend their religious
beliefs to require their children to attend a consolidated secondary school. The Court held that
the state's interest in keeping the children in school did not outweigh the Amish community's
interest in maintaining its religious independence. In making this determination, the Court
observed that:


[a] way of life, however virtuous and admirable, may not be interposed as a
barrier to reasonable state regulation of education if it is based on purely secular
considerations; to have the protection of the Religion Clauses, the claims must be
rooted in religious belief. . . . Thus, if the Amish asserted their claims because of
their subjective evaluation and rejection of the contemporary secular values
accepted by the majority, much as Thoreau rejected the social values of his time
and isolated himself at Walden Pond, their claims would not rest on a religious
basis. Thoreau's choice was philosophical and personal rather than religious, and
such belief does not rise to the demands of the Religion Clauses.



Yoder, 406 U.S. at 215-16 (footnotes omitted) (emphasis added). According to the Comptroller,
this language counteracts any expansive reading of religion undertaken in the conscientious
objector cases, because it focuses the First Amendment analysis squarely, and exclusively, on
the distinction between religious and personal or philosophical beliefs.

 In support, the Comptroller cites several cases that have relied on this distinction
in making the same analysis. See, e.g., Alvarado v. City of San Jose, 94 F.3d 1223, 1229 (9th
Cir. 1996) (New Age beliefs not religious); Mason v. General Brown Cent. Sch. Dist., 851 F.2d
47, 51-52 (2d Cir. 1988) (chiropractic practices not religious); Africa v. Pennsylvania, 662 F.2d
1025, 1036 (3d Cir. 1981) (organization promoting "natural" lifestyle and requiring raw food
diet not a religion in part because based on personal, philosophical beliefs). According to the
Comptroller, the State has an overriding interest in determining with ease and clarity whether a
group is actually "religious" or whether it merely labels itself as religious. See, e.g., Church of
the Chosen People, 548 F. Supp. at 1252-53 (rejecting organization's tax exemption claim based
on members' mere assertions of religious status); Church of Pan v. Norberg, 507 A.2d
1359,1363 (R.I. 1986) (primarily political organization not entitled to tax exemption). The
Comptroller paints Ethical Culture as a belief system based only on the unifying belief that
"within the human experience ethics is central." As one of its founding figures, Felix Adler,
wrote: "Our ethical religion has its basis in the effort to improve the world and ourselves
morally." Although Ethical Culture does not exclude individuals who profess a faith in a
particular understanding of divinity or religion, it is also open to those who do not claim such
beliefs. As the American Ethical Union, an umbrella group for Ethical Culture, reports, "The
Ethical Societies have no creed of theology or metaphysics, no set doctrines concerning the
unknown mysteries of life. There is no claim to a belief in a supernatural universe or Supreme
Being." Consequently, members of the Ethical Society were reluctant to testify that the society
was a "religion" under the Comptroller's definition because, for them, it dealt with human
relationships. (7) According to the Comptroller, statements like these, which emphasize "human
experience," indicate that 

the Ethical Society is only focused on personal, philosophical beliefs because, by the
Comptroller's own definition, the Ethical Society's principles do not embrace any reality beyond
that perceived in human relationships. (8)

 The Ethical Society replies, as a preliminary matter, that the supreme court has, at
least in passing, referred to Ethical Culture as a creedless religion. In Torcaso v. Watkins, 367
U.S. 488 (1961), the Court invalidated a Maryland provision requiring notaries public to swear
an oath "to God" on the grounds that such a requirement would "aid those religions based on a
belief in the existence of God as against those religions founded on different beliefs." Id. at 495. 
In a footnote, the Court included Ethical Culture in a list with Buddhism and Taoism as an
example of a religion that did not teach "what would generally be considered a belief in the
existence of God." Id. at 495 n.11. Likewise, in Seeger, the Court mentioned Ethical Culture in
describing the breadth of religious opinion in the United States. (9) Seeger, 380 

U.S. at 746. The Ethical Society contends that, because the supreme court has twice referred to
its faith system in addressing questions regarding the scope of the First Amendment's
protections, we should consider it to be a religion. 

 Although the supreme court has not unambiguously declared that the practice of
Ethical Culture is a religion protected by the First Amendment, it does not follow that under an
appropriate First Amendment analysis Ethical Culture cannot qualify as a religion. We reject the
Comptroller's reliance on the language regarding the distinction between personal and religious
beliefs outlined in Yoder. While Yoder restates the principle that the First Amendment protects
religions, as opposed to purely personal belief systems, it neither introduces a new concern into
the Court's religion analysis nor articulates a workable test for distinguishing personal from
religious beliefs. The protection of the freedom of religious conscience, without regard to
majority opinion, has been an element of American law since the founding of the Republic. See
Everson v. Board of Educ., 330 U.S. 1, 8-10 (1947) (stating that First Amendment stemmed from
experience of religious majority attempting to impose its views on dissenters, particularly
through the imposition of taxes); see also U.S. v. Macintosh, 283 U.S. 605, 632-33 (1931)
(Hughes, C.J., dissenting) (outlining history of the "conscientious objector" doctrine). 

 Judges are not oracles of theological verity, and the Founders did not intend for
them to be declarants of religious orthodoxy. See Africa, 662 F.2d at 1030 (citing 1 The Papers
of Thomas Jefferson 525, 547 (J. Boyd ed. 1950)). As Justice Clark stated in Seeger, the
distinction between personal and religious beliefs is inherently difficult because "in no field of
human endeavor has the tool of language proved so inadequate." Seeger, 380 U.S. at 175. Any
inquiry that delves too closely into the textual references made by a religion to the existence of
God puts the courts in danger of making determinations based on dimly understood, and perhaps
misconceived, characterizations of unfamiliar religions. See id. at 190 (Douglas, J., concurring)
(discussing potential of Supreme Being test to exclude belief structures of well-established
religions, such as Buddhism and Hinduism); see also International Soc'y for Krishna
Consciousness v. Barber, 650 F.2d 430, 439-40 (2d Cir. 1981) (definition of religion cannot
hinge on "Supreme Being" test in pluralistic society); Theriault v. Silber, 547 F.2d 1279, 1281
(5th Cir. 1977) ("Supreme Being" test too narrow to account for contemporary religious
practices). In sum, the Comptroller's position merely begs the question by looking to Yoder for
a definitive test. Although Yoder reaffirms that the relevant question is whether a set of beliefs
is religious or philosophical, it does not outline a useful test for making that determination.

 Serious contemplation of the supreme court's commitment to protecting the full
range of religious belief, as expressed in Seeger, requires us to reject the proposition that a
narrowly defined "Supreme Being" test can account for the broad range of religious faith
protected by the First Amendment. Although the Ethical Society's tenets and beliefs may not
explicitly reference a divinity, they evidence enough of a sense of spiritual feeling that the
Society's claim to religious status should be carefully assessed. The Comptroller's litmus test
does not allow for a closer assessment of the Ethical Society's claims and, because it forecloses
careful evaluation of the ways in which Ethical Humanism may be more religious than personal,
it violates the First Amendment. (10) Therefore, we hold that the Comptroller's reliance on a
Supreme Being litmus test to determine whether an organization qualifies as a religion for
purposes of the tax code is constitutionally infirm.


The Ethical Society's Status under the Tax Code

 Having determined that the Comptroller's test is invalid under the First
Amendment, we are left with the question of whether, under an appropriate analysis, the Ethical
Society constitutes a religious group. (11) Both parties refer us to the line of cases relying on the
three-factor test laid out by Judge Adams in his concurrence in Malnak v. Yogi, 592 F.2d 197,
207-210 (3d Cir. 1979) (Adams, J., concurring), and later applied by him in Pennsylvania v.
Africa, 662 F.2d 1025, 1032 (3d Cir. 1981). (12) The Malnak test gives a court the basis on which
to determine whether an unfamiliar religion is entitled to First Amendment protection by
comparing it to familiar religions. The test requires that a set of beliefs: (1) address fundamental
and ultimate questions having to do with deep and imponderable matters such as the meaning of
life and death or man's role in the universe; (2) be broad in scope and comprehensive in nature;
and (3) be accompanied by the presence of certain formal and external signs. See Africa, 662
F.2d at 1032. The Comptroller takes the position that Ethical Culture does not meet the Malnak
test because the inclusion of a transcendental being or metaphysical experience is essential to
making the case that a new religion is analogous to a traditionally recognized religion. The
Ethical Society responds that, because it puts weight on external indicia of religious belief, the
Malnak test supports its claim to religious status. While we have already concluded that the
requirement of a belief in a Supreme Being cannot, by itself, serve as the litmus test for
determining which organizations merit religious tax exemptions, we believe that the Malnak test
provides an appropriate guideline for the Comptroller to apply and, further, that Ethical Culture
meets the test's requirements.

Ultimate Concerns

 Ultimate concerns, as addressed by traditional religions, are characterized by their
adherence to, and promotion of, certain "underlying theories of man's nature or his place in the
Universe." Africa, 662 F.2d at 1033 (citing Founding Church of Scientology v. United States,
409 F.2d 1146, 1160 (D.C. Cir. 1969)). Such concerns might include the worship of a Supreme
Being; more generally, they include attempting to situate man within existence and resolving
questions having to do with such things as life and death, right and wrong, or good and evil. Id. 
By focusing on the nature of the questions posed by a group, the court is put in a better position
to compare that group to others that are clearly religious, while avoiding the grant of tax-exempt
status to groups that, by any definition, should not be considered religious. See, e.g., Mason v.
General Brown Cent. Sch. Dist., 851 F.2d 47 (2d Cir. 1988) (general belief, based on
chiropractic training, that immunizations are unhealthy for child not religious belief for First
Amendment purposes and Chiropractic group not religious group because of lack of religious
belief).

 The Ethical Society is part of the American Ethical Union ("the Ethical Union"),
an umbrella group for Ethical Culture congregations founded in 1889. We must assess the
Ethical Society's claims in context of its membership in the larger organization. The Ethical
Union, rather than adopting a formal creed, allows each of its societies to develop relatively
independently. (13) Many of the societies take a less "spiritual" approach. However, other
societies adopt the religious and metaphysical approach embraced by Felix Adler, one of Ethical
Culture's seminal thinkers. Faced with what he considered to be the "definite and permanent
disappearance of the individualistic conception of Deity," Adler sought to articulate the ethical
underpinning he believed to be the foundation of all the great religions. Accordingly, he
formulated the concept of a "spiritual and ethical ideal," now often referred to as the "Ethical
Ideal" or "Ethical Manifold." For Adler, the attempt to reach this understanding reflected a
fundamental, and therefore observable, transcendent reality underlying human thought and
consciousness. He, and the members of the Ethical Culture movement, refused to adopt this
position as an official doctrine because they were committed to the discovery of ethical
principles by individuals learning from their own experiences. Ethical Culture, in its
contemporary form, begins from the proposition that its members cannot simply accept a belief
in a God or higher power as the basis of their religious experience. However, while it rejects the
idea of "spiritual revelations," it does not follow that Ethical Culture rejects a religious approach
to the ultimate questions facing humankind. In place of discussing a supernatural reality, Ethical
Culturists see themselves as discovering religious value and direction from their lives and their
relationships with other people. This is more than a simple statement that they consider "life" to
be an example of religious experience; it is a commitment to an attempt to discover, through
observance and debate, the transcendent moral truths that underlie human experience.

 Our assessment of the scope of the questions posed by Ethical Culture might be
debatable. There can be no doubt that Ethical Culture attempts to address the religious needs of
its members without reference to a God or a supernatural reality. However, we believe that in its
focus on situating each individual within a network of ethical decision-making as the central
concern of that individual's human experience, Ethical Culture poses the kinds of questions that
have been considered by other courts to be "ultimate" in nature.


Comprehensive Belief System

 The requirement that a belief system be comprehensive helps to ensure that we do
not extend the claim of religion to cover a set of isolated, unconnected ideas. This might be
restated as a claim to an "ultimate and comprehensive 'truth.'" See Malnak, 592 F.2d at 209. It
is not enough to show that an individual's actions are based on deeply held convictions as
manifested in their daily lives; rather our analysis should inquire as to whether those convictions
are based on a uniform and articulable set of principles which lay a claim to universal
application. The Comptroller points us to Alvarado v. City of San Jose, in which the court
declared that New Age beliefs have no religious significance because "there is no text, creed, or
organized group" involved. 94 F.3d 1223, 1225 (9th Cir. 1996). 

 By contrast, Ethical Culture has a developed body of literature and a set of
principles. As the Ethical Union posits, "We define ethics not simply and solely in terms of
what is right or wrong, but in the larger sense of what is good and what is true." Thus, according
to the Ethical Union, any attempt to reduce its principles to a specific creed would violate its
adherents' ability to articulate truth and goodness through the practices of Ethical Culture. Some
Ethical Culture documents include injunctions to "treat each other as ends, not merely as
means," that "self-reflection and our social nature require us to shape a more humane world,"
and that "life itself inspires religious response." Books and essays on Ethical Culture and its
practice have been routinely published over the more than a century during which the movement
has existed. Furthermore, beyond simply asserting the primacy of a particular narrow idea or
assumption, Ethical Culture attempts to create a comprehensive response to the problems faced
in life based on a common contemplative practice. While it is true that Ethical Culture
congregations welcome leaders trained in other religious traditions, including priests and rabbis,
such pluralism is not inconsistent with a wide religious viewpoint attempting to assimilate
various opinions about religious faith. Other religious groups maintain an interest in collectivist
or comparative religious observance without thereby jeopardizing their own religious status. In
our review of their literature and beliefs, the Ethical Society appears to offer a set of beliefs
intended to allow an individual to assess his own relationship to creation through the experience
of human interaction and ethical inquiry.

 More fundamentally, the Ethical Union sees the totality of this debate, in both
writing and observance, as an attempt to arrive at an understanding of "humanity's place in the
universe." Ethical Culture is not merely a disassociated string of ethical commitments, but a
commitment to a particular discipline of spiritual observation. The emphasis the Society places
on what Adler described as the "reality producing functions of the mind" focuses its members on
deriving moral commitment from an understanding of human psychological experience and
offers an absolute, and universal, basis on which Ethical Society members are to structure their
own lives.


External Signs

 Because the absence of external signs of religious practice should not be
considered dispositive of a group's religious status, see Malnak, 592 F.2d at 209, the
Comptroller declines to discuss the external factors which might indicate that Ethical Culture
should, indeed, be considered a religion for First Amendment purposes. Such external signs,
however, may still be useful in determining whether a group qualifies as a religion. See id. We
agree with the Comptroller that a group's external manifestation of religious practice is not
necessarily sufficient, by itself, to confer religious status. However, when coupled with a belief
system that is, at least arguably, concerned with ultimate questions and comprehensive in nature,
such factors swing the balance towards considering a group to be a religion.

 In ruling that organizations are not religions, courts often emphasize their lack of
certain practices or characteristics. The organizations held not to be religions in the cases cited
by the Comptroller have lacked many of the features that would have made them more akin to
traditional religious practices. They have lacked life ceremonies, such as naming ceremonies
and ceremonial marriage. See Church of Pan, 507 A.2d at 1363; Church of the Chosen People,
548 F. Supp. at 1253. They have lacked trained clergy. Mason, 851 F.2d 47, 53; Church of the
Chosen People, 548 F. Supp. at 1253, Ideal Life Church v. County of Washington, 304 N.W.2d
308, 311 (Minn. 1981). Nor have they been able to demonstrate a coherent and uniform body of
literature supporting and elaborating on their religious ideals. See Mason, 851 F.2d at 53;
Church of the Chosen People, 548 F. Supp. at 1253; Church of Pan, 507 A.2d at 1363; Ideal Life
Church, 304 N.W.2d at 311. Most importantly, some of these organizations have not even
bothered to set up a separate corporate entity and have funneled their funds, which they claim to
have been used for religious purposes, into the private accounts of individuals who have used
that money almost exclusively for personal expenses. E.g., Church of the Chosen People, 548 F.
Supp. at 1253; Ideal Life Church, 304 N.W.2d at 311 (under state tax provisions, subdivision
could not declare itself a religion in order to enjoy tax-exempt status).

 By contrast, Ethical Culture has the marks of a traditional religious organization. 
Indeed, with a history dating back to 1876, Ethical Culture does appear to function in a way
analogous to more established religious groups. It maintains a bona fide separate corporate
existence. It possesses a coherent literature. Ethical Culture groups meet regularly, typically on
Sundays, for services including ceremonial practices. Those services are led by a group of
clergy, most of whom have been educated at theological institutes and seminaries. The same
trained clergy perform life cycle rituals, including marriages and naming ceremonies. The
services are supplemented with religious instruction for children. The Ethical Society of Austin
has such meetings, coordinated by professional clergy, and meets regularly on Sundays. Taken
together, these factors indicate to us a sincere attempt by the Ethical Society, and its sister
groups, to undertake to provide the benefits of a traditional religion. In light of our
understanding of the structure of Ethical Culture's principles, these external indications of
religious faith mark an important factor for determining whether the Ethical Society is a religion. 

 Organizations such as the Ethical Society are entitled under the First Amendment
to a careful assessment of their claim to religious status. Such an assessment requires careful
analysis of all the factors we have discussed in this opinion. We do not conclude that the
Comptroller may never consider whether an organization espouses a belief in a Supreme Being;
such an inquiry may be instructive in evaluating the types of ideas espoused by a particular
applicant group. Instead, we hold that belief in a supernatural reality must serve, at most, as part
of a broader inquiry that investigates both an organization's beliefs and the means by which
those beliefs are put into action. Ethical Culture's practices and beliefs, in our opinion, address
ultimate concerns and present a comprehensive belief system. Without question, their practices
and rituals constitute the external signs of a religion. In short, the Ethical Society manifests its
spiritual beliefs through organized observance; we cannot say that this activity falls outside of
the scope of the First Amendment's protection, and we believe, therefore, that it must fall within
the legislature's intent in granting the tax exemptions in question. Having held that the
Comptroller's requirement that a group believe in a Supreme Being, applied as the sole test for
determining the grant of religious tax exemptions, violates the First Amendment, we now hold
that, under the Malnak analysis, Ethical Culture qualifies as a religion for First Amendment
purposes.


CONCLUSION

 Because we understand the First Amendment to require a broader definition of
what should be considered a religion than the simple Supreme Being litmus test offered by the
Comptroller, and because we believe that under such an analysis Ethical Culture should be so
considered, we affirm the trial court's judgment.



 

 Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed: March 6, 2003

1. [1] "Ethical Culture" (sometimes known as "Ethical Humanism") is a nationwide and
international movement established in 1876.
2. [2] The record reflects that Barton had full authority to make this determination based on the
input of the Tax Policy Group.
3. [3] Sharp's successor, Carole Keeton Strayhorn, has adopted Sharp's position regarding the
Society's request for tax-exempt status.
4. [4] In addition, the trial court ruled that the denial of tax-exempt status violated the Texas Tax
Code and the Equal Protection Clause of the U.S. Constitution and permanently enjoined the
Comptroller from using "worshiping God" or "worshiping a Supreme Being" as the litmus test for
determining an organization's tax-exempt status. The trial court also awarded attorney's fees to the
Ethical Society.
5. [5] The section of the tax code dealing with franchise taxes states that: 


[a] nonprofit corporation organized for the purpose of religious worship is exempted from
the franchise tax. 


Tex. Tax Code Ann. § 171.057 (West 2002).


 The section of the tax code dealing with sales and use tax states that for religious,
educational, and public service organizations:


(a) A taxable item sold, leased, or rented to, or stored, used, or consumed by any of the
following organizations is exempted from the taxes imposed by this chapter:


 (1) an organization created for religious, educational, or charitable purposes if no part of the
net earnings of the organization benefits a private shareholder or individual and
the items purchased, leased, or rented are related to the purpose of the
organization.


Tex. Tax Code Ann. § 151.310(a)(1).


 The hotel tax provision is essentially identical to the sales and use tax provision. See Tex.
Tax Code Ann. § 156.102(a).
6. [6] The Comptroller's rules define a religious group for each of the tax exemptions in question
as:


an organized group of people regularly meeting for the primary purpose of holding,
conducting, and sponsoring religious worship services according to the rites of their sect.


34 Tex. Admin. Code §§ 3.161(a)(3), 3.322(a)(3), 3.541(c)(3) (2002).
7. [7] Two expert witnesses for the Ethical Society testified that Ethical Culture is widely
accepted as a religion by the academic religious community.
8. [8] The Comptroller also cites us to Peloza v. Capistrano Unified School District,
which denies that "evolutionism or secular humanism are 'religions' for Establishment Clause
purposes," 37 F.3d 517, 521 (9th Cir. 1994), and asks us to adopt Peloza's reasoning. However,
Peloza dealt with "secular humanism," an attempt to characterize a group of unorganized secular
viewpoints as a religion defined as the opposite of "creationism." See id. 
9. [9] As part of its catalogue of the scope of religious faith and identity in the United States, the
Seeger court referenced a book written by one of the leaders of the Ethical Culture movement, Dr.
Saville Muzzy, Ethics as a Religion (1951). The passage read:


Instead of positing a personal God, whose existence man can neither prove nor disprove,
the ethical concept is founded on human experience. It is anthropocentric, not theocentric. 
Religion, for all the various definitions that have been given of it, must surely mean the
devotion of man to the highest ideal that he can conceive. And that ideal is a community
of spirits in which the latent moral potentialities of men shall have been elicited by their
reciprocal endeavors to cultivate the best in their fellow men. What ultimate reality is we
do not know; but we have the faith that it expresses itself in the human world as the power
which inspires in men moral purpose. 

 

Thus the "God" that we love is not the figure on the great white throne, but the perfect pattern,
envisaged by faith, of humanity as it should be, purged of the evil elements which retard its progress
toward 'the knowledge, love, and practice of the right.'


United States v. Seeger, 380 U.S. 163, 183 (1965) (citing Muzzy at 95, 98). The Comptroller takes
the position that this passage, as reported in the supreme court's opinion, disqualifies the Ethical
Society from being a religious organization because it disclaims any belief in God. While it may
be debatable whether this passage actually constitutes a denial of the existence of God or rather an
attempt to articulate a particular vision of God, we reject the Comptroller's assertion because it does
no more than beg the question.
10. [10] Likewise, we reject the Comptroller's argument that our assessment of the Ethical
Society's religious nature and purpose should be based on the "common understanding" of the term
"religion." Although many of the definitions cited to us by the Comptroller do include the concept
of a Supreme Being or a supernatural reality, e.g., Black's Law Dictionary 1292 (6th ed. 1990)
(religion "in its broadest sense includes all forms of belief in the existence of superior beings
exercising power over human beings. . ."), the purpose of the First Amendment is to protect
dissenters from being forced to take the position favored by the majority in violation of their own
religious consciences. See Everson v. Board of Educ., 330 U.S. 1, 8-10 (1947). Because the scope
of religious belief defies easy characterization, we believe that a constitutionally sufficient inquiry
cannot be bound by this particular common understanding of religion. Otherwise, the courts would
find themselves as a matter of law declaring entire belief systems that certainly qualify as
religions-- such as Buddhism, Taoism, and some strains of Unitarianism--to be outside of the First
Amendment's protection.
11. [11] The Comptroller cites several concurring and dissenting opinions that might suggest
that, given the different nature of federal and state government, the Establishment Clause and other
elements of the Bill of Rights incorporated against the states by the Fourteenth Amendment should
be applied differently in the state courts. E.g., Zelman v. Simmons-Harris, __ U.S. __, 122 S. Ct.
2460, 2480-81, 153 L. Ed. 2d 604, 633 (2002) (Thomas, J., concurring). The situation before us,
however, encompasses not the policy decisions made by a state government regarding religious
programs and activities generally, but a specific determination regarding a specific belief
community. We believe that the First Amendment protections must be at their strongest when the
government feels itself called upon, by administrative proceeding or legislative mandate, to
categorize the content of various belief systems as religious or nonreligious.
12. [12] Because neither side has placed in issue the sincerity of the Ethical Society's beliefs, we
are not in the situation of courts dealing with organizations seeking exempt status which are
"obviously shams and absurdities" and whose leaders "are patently devoid of religious sincerity." 
See Theriault v. Carlson, 495 F.2d 390, 395 (5th Cir. 1974).
13. [13] In this regard, according to the record, Ethical Culture is similar to the Unitarian
Universalist Church, which allows each of its congregations to adopt differing approaches to
doctrine and belief.