# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00066-CV

**Carole Keeton Strayhorn, in her Official Capacity as Comptroller of
Public Accounts, Appellant**

**v.**

**Ethical Society of Austin, f/k/a Ethical Culture Fellowship of Austin, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353D JUDICIAL DISTRICT
### NO. 98-12853, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## O P I N I O N

The Ethical Society of Austin (Athe Ethical Society@), a congregation of individuals who meet regularly to practice a belief system known as AEthical Culture,@ seeks tax-exempt status as a religious organization under the tax code. *See* Tex. Tax Code Ann. '' 171.058, 151.310(a)(1), 156.012 (West 2002). The Texas Comptroller denied the application on the ground that the Ethical Society must demonstrate that it requires belief in a AGod, Gods, or higher power@ (hereinafter Athe Supreme Being test@) in order to qualify. The trial court found that the Ethical Society should not have been denied tax-exempt status because the Comptroller=s test was unconstitutionally underinclusive and that the Ethical Society should have qualified for the requested tax exemptions. We must now decide whether a state government

may, consistent with the First Amendment to the United States Constitution, require a group to demonstrate its belief in a ASupreme Being@ in order to be considered a religion for statutory purposes. Because the Comptroller=s test fails to include the whole range of belief systems that may, in our diverse and pluralistic society, merit the First Amendment=s protection, we will affirm the trial court=s judgment.

## BACKGROUND

In 1995, the Ethical Society, then known as the AEthical Culture Fellowship of Austin,@ organized the first ethical culture group in Texas. Society members characterize themselves as Aethical humanists,@ sharing the unifying belief that Awithin the human experience ethics is central.@[1] In 1996, the Society applied with the Comptroller=s Office for tax-exempt status from sales, use, excise, hotel, and franchise taxes as a Areligious@ organization. *See* Tex. Tax Code Ann. '' 171.058, 151.310(a)(1), 156.012.

---

[1] AEthical Culture@ (sometimes known as AEthical Humanism@) is a nationwide and international movement established in 1876.

The Society filed a tax exemption application accompanied by detailed information about its beliefs and activities. Initially, the Comptroller=s office determined that the Society did not qualify for tax-exempt status. However, after receiving additional information the Comptroller=s office set the application for a higher-level review. The Tax Policy Group, which comprises the highest ranking officials in the Comptroller=s office, considered the entire application, including several citations to United States Supreme Court decisions that seemed to indicate that the Society was, indeed, a religious organization. Based on this record, Karey Barton, an official of the Comptroller=s office,[2] sent a letter to the Society indicating that it qualified for the requested tax exemptions.

Shortly after the Society received the letter granting it tax-exempt status, the local newspaper published a story detailing the determination made by the Comptroller=s office. *See* Ken Herman, *Godless Group Gets Religious Exemption*, Austin American-Statesman, June 26, 1997, at B1. Then-Comptroller John Sharp learned about the Tax Policy Group=s determination from the article. The Comptroller=s office soon issued a Aletter of correction,@ stating that the original determination applied and that the Society was not a Areligious organization@ for purposes of the tax code. Subsequently, the Comptroller confirmed that the Society did not qualify for a tax exemption because it failed to meet the

---

[2] The record reflects that Barton had full authority to make this determination based on the input of the Tax Policy Group.

definition of Areligion,@ which the Comptroller construes to require worship of a Supreme Being for the

purpose of interpreting the administrative rules.**3**

---

**3** Sharp=s successor, Carole Keeton Strayhorn, has adopted Sharp=s position regarding the Society=s request for tax-exempt status.

The Ethical Society challenged the Comptroller=s decision. Sitting without a jury, the trial court determined that, by using its formulation of the ASupreme Being@ test as the primary basis for determining which organizations are Areligious@ for tax-exemption purposes, the Comptroller had violated the First Amendment.[4] On appeal, the Comptroller contends that the ASupreme Being@ test creates a necessary bright-line rule protecting the state from being required to award tax exemption to any group that calls itself Areligious.@ Relying on language contained in the United States Supreme Court=s opinion in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Comptroller asserts that its rule is consistent with the principle that Areligious@ beliefs must be clearly delineated from Apersonal or philosophical@ beliefs. The Ethical Society, joined by various *amici curiae*, responds that the Comptroller=s test too narrowly defines the scope of religion. Relying on several United States Supreme Court opinions that seem to include Ethical Culture within a group of religions, the Ethical Society argues that the ASupreme Being@ test, when applied as the sole determining factor for granting tax exemptions, does not adequately account for the range of belief systems which comprise the broad spectrum of religious faith in contemporary society. We agree with the Ethical Society and will affirm.

## DISCUSSION

**The Supreme Being Test**

---

[4] In addition, the trial court ruled that the denial of tax-exempt status violated the Texas Tax Code and the Equal Protection Clause of the U.S. Constitution and permanently enjoined the Comptroller from using Aworshiping God@ or Aworshiping a Supreme Being@ as the litmus test for determining an organization=s tax-exempt status. The trial court also awarded attorney=s fees to the Ethical Society.

Because this dispute presents us with a constitutional issue, we review the trial court=s decision de novo. *See, e.g., Perry v. Del Rio*, 67 S.W.3d 85, 91 (Tex. 2001). Thus, we owe no deference to the trial court=s decision and may proceed to resolve the issues presented as a matter of law. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998).

The Legislature has provided that certain religious, educational, and charitable groups are exempt from the franchise, sales and use, and hotel taxes.[5] *See* Tex. Tax Code Ann. '' 171.058, 151.310(a)(1), 156.012. The Comptroller=s implementing administrative rules require that a group be organized for the purpose of religious worship.[6] *See* 34 Tex. Admin. Code '' 3.161(a)(3), .322(a)(3), .541(c)(3) (2002). Because exempt status is not favored by state law, any organization seeking a tax exemption has the burden to show, without doubt, that it meets the applicable requirements and any doubt regarding the organization=s qualifications will result in denial of the exemption. *See id.* '' 3.322(a)(1), (a)(2) (sales and use tax), .541(a)(1) (franchise tax), .161(c) (hotel tax) (2002). The Comptroller assesses each application according to a non-exclusive set of factors set out in internal agency documents, most of which are objective factors, including whether the organization meets regularly for services, when and where services are held, the approximate number of people attending services, and whether the organization ordains clergy. In addition, the Comptroller has apparently made an informal determination, applied in this case, that an organization must meet what we have called the Supreme Being test, requiring belief in a AGod, Gods, or higher power@ in order to qualify for tax-exempt status.

---

[5] The section of the tax code dealing with franchise taxes states that:

**6**

This Supreme Being requirement does not appear in the tax code or the administrative code. From the documents contained in the record, it appears that the Ethical Society met all of the objective requirements contained within the Comptroller=s internal memorandum: among other things, it holds regular meetings, maintains a separate bank account that profits no individual, and undertakes only activities having to do with its congregational meetings. The Tax Policy Group, based on the Ethical

---

[a] nonprofit corporation organized for the purpose of religious worship is exempted from the franchise tax.

Tex. Tax Code Ann. ' 171.057 (West 2002).

The section of the tax code dealing with sales and use tax states that for religious, educational, and public service organizations:

(a) A taxable item sold, leased, or rented to, or stored, used, or consumed by any of the following organizations is exempted from the taxes imposed by this chapter:

(1) an organization created for religious, educational, or charitable purposes if no part of the net earnings of the organization benefits a private shareholder or individual and the items purchased, leased, or rented are related to the purpose of the organization.

Tex. Tax Code Ann. ' 151.310(a)(1).

The hotel tax provision is essentially identical to the sales and use tax provision. *See* Tex. Tax Code Ann. ' 156.102(a).

[6] The Comptroller=s rules define a religious group for each of the tax exemptions in question as:

an organized group of people regularly meeting for the primary purpose of holding, conducting, and sponsoring religious worship services according to the rites of their sect.

34 Tex. Admin. Code '' 3.161(a)(3), 3.322(a)(3), 3.541(c)(3) (2002).

Society=s application, granted the exemption. It appears, then, that the Comptroller=s decision was based entirely on the determination that Ethical Culture does not require belief in a Supreme Being.

As a background matter, we recognize that the State may, consistent with the Constitution, exempt religious groups from taxation. *See Mueller v. Allen,* 463 U.S. 388, 403 (1983); *Walz v. Tax Comm=n of New York*, 397 U.S. 664, 707-08 (1970). We also recognize that the State has a compelling interest in insuring that only qualified religious organizations receive the tax exemptionCit cannot be sufficient for a group simply to label itself as a religion in order to enjoy tax-exempt status. *See, e.g.*, *Church of the Chosen People v. United States*, 548 F. Supp. 1247, 1252-53 (D. Minn. 1982). However, this case involves a determination of whether the Comptroller=s Supreme Being litmus test is a valid means for determining whether the Ethical Society is a religious group under the tax code.

Although Texas courts have not addressed this issue, the slate on which we write is not blank. Many courts and state administrative agencies have long determined that Ethical Culture is a religion for the purpose of interpreting various government regulations. *See, e.g.*, *Washington Ethical Soc=y v. District of Columbia*, 249 F.2d 127, 129 (D.C. Cir. 1957) (interpreting Washington, D.C., property tax exemption); *Society for Ethical Culture v. Spatt*, 415 N.E.2d 449, 452 (N.Y. 1980) (Ethical Society held religious organization for purpose of analyzing impact of architectural preservation law on its property); *Murray v. Comptroller of the Treasury*, 216 A.2d 897, 901 (Md. 1965) (Maryland religious tax exemption constitutionally sound in part because Ethical Culture considered tax-exempt); *Fellowship of Humanity v. County of Alameda*, 315 P.2d 394, 410 (Cal. App. 1957) (interpreting California constitution to require tax exemption for Ethical Culture under tax code); *State of Illinois v. Ethical*

**8**

*Humanist Soc=y*, 95 ST 0257, *10 (December 14, 1995) (administrative decision of Illinois Department of Revenue that Ethical Culture merited tax exemption).  Although none of these determinations are based explicitly on First Amendment grounds, they all represent the reasoned application of statutes in light of contemporary cultural and religious values.  This judicial history is persuasive in suggesting that the Comptroller=s test and decision are out of step with the general understanding of the grant of tax exemptions to Areligious@ organizations in the United States.

The Comptroller relies on the supreme court=s declaration in *Wisconsin v. Yoder* that a way of life, however virtuous and admirable, will not have First Amendment protection unless it is rooted in Areligious belief.@  406 U.S. 405, 415 (1972).  The Comptroller argues that only its Supreme Being test adequately distinguishes between personal and religious beliefs.  Furthermore, because the test encompasses the generic concept of a supernatural reality, the Comptroller asserts that it is sufficiently broad to account for the various diverse religious views existing in  contemporary society.  The Comptroller=s argument rests on its understanding of the development of the supreme court=s interpretation of the First Amendment religious protections.  Initially, the First Amendment was, indeed, understood to protect only those who believed in a monotheistic deity.  *See Davis v. Beason*, 133 U.S. 333, 342 (1890) (AThe term >religion= has reference to one=s views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will.@).

However, in two more recent cases interpreting the federal conscientious objector statute, *United States v. Seeger*, 380 U.S. 163 (1965), and *Welsh v. United States*, 398 U.S. 333 (1970), the Court adopted a broader definition of religion.  The Universal Military Training and Service Act exempted

**9**

from military service persons Awho by reason of their religious training and belief are conscientiously opposed to participation in war in any form.@ *See Seeger*, 380 U.S. at 736. The statute defined religious belief as Abelief in a relation to a Supreme Being involving duties superior to those arising from any human relation.@ *See id.* at 741. In interpreting the statute, the *Seeger* court carefully examined a number of religious and philosophical viewpoints in order to avoid too narrow an analysis of individual belief. *Id.* at 746-47. Thus, in the context of interpreting a specific statutory provision, the Court saw fit to interpret the term Areligion@ broadly in order to take into account the breadth of religious opinion in American society.

According to the Comptroller, however, in *Yoder* the Court took a step back from its position in *Seeger* and *Welsh*. *Yoder* involved an attempt by the state of Wisconsin to enforce its mandatory schooling provisions, which required children to attend school until the age of sixteen, against a group of Old Order Amish, who maintained that it would offend their religious beliefs to require their children to attend a consolidated secondary school. The Court held that the state=s interest in keeping the children in school did not outweigh the Amish community=s interest in maintaining its religious independence. In making this determination, the Court observed that:

> [a] way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on *purely secular considerations*; to have the protection of the Religion Clauses, the claims must be rooted in religious belief. . . . Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. Thoreau=s choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses.

*Yoder*, 406 U.S. at 215-16 (footnotes omitted) (emphasis added).  According to the Comptroller, this language counteracts any expansive reading of religion undertaken in the conscientious objector cases, because it focuses the First Amendment analysis squarely, and exclusively, on the distinction between religious and personal or philosophical beliefs.

In support, the Comptroller cites several cases that have relied on this distinction in making the same analysis.  *See, e.g.*, *Alvarado v. City of San Jose*, 94 F.3d 1223, 1229 (9th Cir. 1996) (New Age beliefs not religious); *Mason v. General Brown Cent. Sch. Dist*., 851 F.2d 47, 51-52 (2d Cir. 1988) (chiropractic practices not religious); *Africa v. Pennsylvania*, 662 F.2d 1025, 1036 (3d Cir. 1981) (organization promoting Anatural@ lifestyle and requiring raw food diet not a religion in part because based on personal, philosophical beliefs).  According to the Comptroller, the State has an overriding interest in determining with ease and clarity whether a group is actually Areligious@ or whether it merely *labels itself* as religious.  *See, e.g.*, *Church of the Chosen People*, 548 F. Supp. at 1252-53 (rejecting organization=s tax exemption claim based on members= mere assertions of religious status); *Church of Pan v. Norberg*, 507 A.2d 1359,1363 (R.I. 1986) (primarily political organization not entitled to tax exemption).  The Comptroller paints Ethical Culture as a belief system based only on the unifying belief that Awithin the human experience ethics is central.@  As one of its founding figures, Felix Adler, wrote: AOur ethical religion has its basis in the effort to improve the world and ourselves morally.@  Although Ethical Culture does not exclude individuals who profess a faith in a particular understanding of divinity or religion, it is also open to those who do not claim such beliefs.  As the American Ethical Union, an umbrella group for Ethical Culture,

**11**

reports, AThe Ethical Societies have no creed of theology or metaphysics, no set doctrines concerning the unknown mysteries of life.  There is no claim to a belief in a supernatural universe or Supreme Being.@ Likewise, many of the members of the Ethical Society who were deposed in the course of the trial were reluctant to classify the society as a Areligion@ because, for them, it dealt with human relationships. According to the Comptroller, statements like these, which emphasize Ahuman experience,@ indicate that the Ethical Society is only focused on personal, philosophical beliefs because, by the Comptroller=s own definition, the Ethical Society=s principles do not embrace any reality beyond that perceived in human relationships.[7]

---

[7] The Comptroller also cites us to *Peloza v. Capistrano Unified School District*, which denies that Aevolutionism or secular humanism are >religions= for Establishment Clause purposes,@ 37 F.3d 517, 521 (9th Cir. 1994), and asks us to adopt *Peloza*=s reasoning.  However, *Peloza* dealt with Asecular humanism,@ an attempt to characterize a group of unorganized secular viewpoints as a religion defined as the opposite of Acreationism.@ *See id*.

The Ethical Society replies, as a preliminary matter, that the supreme court has, at least in passing, referred to Ethical Culture as a creedless religion. In *Torcaso v. Watkins*, 367 U.S. 488 (1961), the Court invalidated a Maryland provision requiring notaries public to swear an oath Ato God@ on the grounds that such a requirement would Aaid those religions based on a belief in the existence of God as against those religions founded on different beliefs.@ *Id.* at 495. In a footnote, the Court included Ethical Culture in a list with Buddhism and Taoism as an example of a religion that did not teach Awhat would generally be considered a belief in the existence of God.@ *Id.* at 495 n.11. Likewise, in *Seeger*, the Court mentioned Ethical Culture in describing the breadth of religious opinion in the United States.[8] *Seeger*, 380

---

[8] As part of its catalogue of the scope of religious faith and identity in the United States, the *Seeger* court referenced a book written by one of the leaders of the Ethical Culture movement, Dr. Saville Muzzy, *Ethics as a Religion* (1951). The passage read:

> Instead of positing a personal God, whose existence man can neither prove nor disprove, the ethical concept is founded on human experience. It is anthropocentric, not theocentric. Religion, for all the various definitions that have been given of it, must surely mean the devotion of man to the highest ideal that he can conceive. And that ideal is a community of spirits in which the latent moral potentialities of men shall have been elicited by their reciprocal endeavors to cultivate the best in their fellow men. What ultimate reality is we do not know; but we have the faith that it expresses itself in the human world as the power which inspires in men moral purpose.

> Thus the AGod@ that we love is not the figure on the great white throne, but the perfect pattern, envisaged by faith, of humanity as it should be, purged of the evil elements which retard its progress toward >the knowledge, love, and practice of the right.=

*United States v. Seeger*, 380 U.S. 163, 183 (1965) (citing Muzzy at 95, 98). The Comptroller takes the position that this passage, as reported in the supreme court=s opinion, disqualifies the Ethical Society from being a religious organization because it disclaims any belief in God. While it may be debatable whether this passage actually constitutes a denial of the existence of God or rather an attempt to articulate a particular vision of God, we reject the Comptroller=s assertion because it does no more than beg the question.

U.S. at 746. The Ethical Society contends that, because the supreme court has twice referred to its faith system in addressing questions regarding the scope of the First Amendment=s protections, we should consider it to be a religion.

Although the supreme court has not unambiguously declared that the practice of Ethical Culture is a religion protected by the First Amendment, it does not follow that under an appropriate First Amendment analysis Ethical Culture cannot qualify as a religion. We reject the Comptroller=s reliance on the language regarding the distinction between personal and religious beliefs outlined in *Yoder*. While *Yoder* restates the principle that the First Amendment protects religions, as opposed to purely personal belief systems, it neither introduces a new concern into the Court=s religion analysis nor articulates a workable test for distinguishing personal from religious beliefs. The protection of the freedom of religious conscience, without regard to majority opinion, has been an element of American law since the founding of the Republic. *See Everson v. Board of Educ.*, 330 U.S. 1, 8-10 (1947) (stating that First Amendment stemmed from experience of religious majority attempting to impose its views on dissenters, particularly through the imposition of taxes); *see also U.S. v. Macintosh*, 283 U.S. 605, 632-33 (1931) (Hughes, C.J., dissenting) (outlining history of the Aconscientious objector@ doctrine).

Judges are not oracles of theological verity, and the Founders did not intend for them to be declarants of religious orthodoxy. *See Africa*, 662 F.2d at 1030 (citing 1 *The Papers of Thomas Jefferson* 525, 547 (J. Boyd ed. 1950)). As Justice Clark stated in *Seeger*, the distinction between personal and religious beliefs is inherently difficult because Ain no field of human endeavor has the tool of language proved so inadequate.@ *Seeger*, 380 U.S. at 175. Any inquiry that delves too closely into the

**14**

textual references made by a religion to the existence of God puts the courts in danger of making determinations based on dimly understood, and perhaps misconceived, characterizations of unfamiliar religions. *See id.* at 190 (Douglas, J., concurring) (discussing potential of Supreme Being test to exclude belief structures of well-established religions, such as Buddhism and Hinduism); *see also International Soc=y for Krishna Consciousness v. Barber*, 650 F.2d 430, 439-40 (2d Cir. 1981) (definition of religion cannot hinge on ASupreme Being@ test in pluralistic society); *Theriault v. Silber*, 547 F.2d 1279, 1281 (5th Cir. 1977) (ASupreme Being@ test too narrow to account for contemporary religious practices). In sum, the Comptroller=s position merely begs the question by looking to *Yoder* for a definitive test. Although *Yoder* reaffirms that the relevant question is whether a set of beliefs is religious or philosophical, it does not outline a useful test for making that determination.

Serious contemplation of the supreme court=s commitment to protecting the full range of religious belief, as expressed in *Seeger*, requires us to reject the proposition that a narrowly defined ASupreme Being@ test can account for the broad range of religious faith protected by the First Amendment. Although the Ethical Society=s tenets and beliefs may not explicitly reference a divinity, they evidence enough of a sense of *spiritual feeling* that the Society=s claim to religious status should be carefully assessed. The Comptroller=s litmus test does not allow for a closer assessment of the Ethical Society=s claims and, because it forecloses careful evaluation of the ways in which Ethical Humanism may be more religious than personal, it violates the First Amendment.[9] Therefore, we hold that the Comptroller=s reliance on a Supreme Being

---

[9] Likewise, we reject the Comptroller=s argument that our assessment of the Ethical Society=s religious nature and purpose should be based on the Acommon understanding@ of the term Areligion.@ Although many of the definitions cited to us by the Comptroller do include the concept of a Supreme Being

**15**

litmus test to determine whether an organization qualifies as a religion for purposes of the tax code is constitutionally infirm.

**The Ethical Society=s Status under the Tax Code**



or a supernatural reality, *e.g.*, *Black=s Law Dictionary* 1292 (6th ed. 1990) (religion Ain its broadest sense includes all forms of belief in the existence of superior beings exercising power over human beings. . .@), the purpose of the First Amendment is to protect dissenters from being forced to take the position favored by the majority in violation of their own religious consciences. *See Everson v. Board of Educ.*, 330 U.S. 1, 8-10 (1947). Because the scope of religious belief defies easy characterization, we believe that a constitutionally sufficient inquiry cannot be bound by this particular common understanding of religion. Otherwise, the courts would find themselves as a matter of law declaring entire belief systems that certainly qualify as religionsC such as Buddhism, Taoism, and some strains of UnitarianismCto be outside of the First Amendment=s protection.

Having determined that the Comptroller=s test is invalid under the First Amendment, we are left with the question of whether, under an appropriate analysis, the Ethical Society constitutes a religious group.[10] Both parties refer us to the line of cases relying on the three-factor test laid out by Judge Adams in his concurrence in *Malnak v. Yogi*, 592 F.2d 197, 207-210 (3d Cir. 1979) (Adams, J., concurring), and later applied by him in *Pennsylvania v. Africa*, 662 F.2d 1025, 1032 (3d Cir. 1981).[11] The *Malnak* test gives a court the basis on which to determine whether an unfamiliar religion is entitled to First Amendment protection by comparing it to familiar religions. The test requires that a set of beliefs: (1) address fundamental and ultimate questions having to do with deep and imponderable matters such as the meaning of life and death or man=s role in the universe; (2) be broad in scope and comprehensive in nature; and (3) be accompanied by the presence of certain formal and external signs. *See Africa*, 662 F.2d at 1032. The Comptroller takes the position that Ethical Culture does not meet the *Malnak* test because the inclusion of a transcendental being or metaphysical experience is essential to making the case that a new religion is

---

[10]    The Comptroller cites several concurring and dissenting opinions that might suggest that, given the different nature of federal and state government, the Establishment Clause and other elements of the Bill of Rights incorporated against the states by the Fourteenth Amendment should be applied differently in the state courts. *E.g.*, *Zelman v. Simmons-Harris*, __ U.S. __, 122 S. Ct. 2460, 2480-81, 153 L. Ed. 2d 604, 633 (2002) (Thomas, J., concurring). The situation before us, however, encompasses not the policy decisions made by a state government regarding religious programs and activities generally, but a specific determination regarding a specific belief community. We believe that the First Amendment protections must be at their strongest when the government feels itself called upon, by administrative proceeding or legislative mandate, to categorize the content of various belief systems as religious or nonreligious.

[11]    Because neither side has placed in issue the sincerity of the Ethical Society=s beliefs, we are not in the situation of courts dealing with organizations seeking exempt status which are Aobviously shams and absurdities@ and whose leaders Aare patently devoid of religious sincerity.@ *See Theriault v. Carlson*, 495 F.2d 390, 395 (5th Cir. 1974).

**17**

analogous to a traditionally recognized religion. The Ethical Society responds that, because it puts weight on external indicia of religious belief, the *Malnak* test supports its claim to religious status. While we have already concluded that the requirement of a belief in a Supreme Being cannot, by itself, serve as the litmus test for determining which organizations merit religious tax exemptions, we believe that the *Malnak* test provides an appropriate guideline for the Comptroller to apply and, further, that Ethical Culture meets the test=s requirements.

### *Ultimate Concerns*

Ultimate concerns, as addressed by traditional religions, are characterized by their adherence to, and promotion of, certain Aunderlying theories of man=s nature or his place in the Universe.@ *Africa*, 662 F.2d at 1033 (citing *Founding Church of Scientology v. United States*, 409 F.2d 1146, 1160 (D.C. Cir. 1969)). Such concerns might include the worship of a Supreme Being; more generally, they include attempting to situate man within existence and resolving questions having to do with such things as life and death, right and wrong, or good and evil. *Id.* By focusing on the nature of the questions posed by a group, the court is put in a better position to compare that group to others that are clearly religious, while avoiding the grant of tax-exempt status to groups that, by any definition, should not be considered religious. *See, e.g.*, *Mason v. General Brown Cent. Sch. Dist.*, 851 F.2d 47 (2d Cir. 1988) (general belief, based on chiropractic training, that immunizations are unhealthy for child not religious belief for First Amendment purposes and Chiropractic group not religious group because of lack of religious belief).

The Ethical Society is part of the American Ethical Union (Athe Ethical Union@), an umbrella group for Ethical Culture congregations founded in 1889. We must assess the Ethical Society=s claims in

**18**

context of its membership in the larger organization. The Ethical Union, rather than adopting a formal creed, allows each of its societies to develop relatively independently.[12] Many of the societies take a less Aspiritual@approach. However, other societies adopt the religious and metaphysical approach embraced by Felix Adler, one of Ethical Culture=s seminal thinkers. Faced with what he considered to be the Adefinite and permanent disappearance of the individualistic conception of Deity,@ Adler sought to articulate the ethical underpinning he believed to be the foundation of all the great religions. Accordingly, he formulated the concept of a Aspiritual and ethical ideal,@ now often referred to as the AEthical Ideal@ or AEthical Manifold.@ For Adler, the attempt to reach this understanding reflected a fundamental, and therefore observable, transcendent reality underlying human thought and consciousness. He, and the members of the Ethical Culture movement, refused to adopt this position as an official doctrine because they were committed to the discovery of ethical principles by individuals learning from their own experiences. Ethical Culture, in its contemporary form, begins from the proposition that its members cannot simply accept a belief in a God or higher power as the basis of their religious experience. However, while it rejects the idea of Aspiritual revelations,@ it does not follow that Ethical Culture rejects a religious approach to the ultimate questions facing humankind. In place of discussing a supernatural reality, Ethical Culturists see themselves as discovering religious value and direction from their lives and their relationships with other people. This is more than a simple statement that they consider Alife@ to be an example of religious experience; it is a

---

[12] In this regard, according to the record, Ethical Culture is similar to the Unitarian Universalist Church, which allows each of its congregations to adopt differing approaches to doctrine and belief.

commitment to an attempt to discover, through observance and debate, the moral truths that underlie human experience.

Our assessment of the scope of the questions posed by Ethical Culture might be debatable. There can be no doubt that Ethical Culture attempts to address the religious needs of its members *without* reference to a God or a supernatural reality. However, we believe that in its focus on situating each individual within a network of ethical decision-making as the central concern of that individual-s human experience, Ethical Culture makes at least a colorable claim at posing the kinds of questions that have been considered by other courts to be Aultimate@ in nature.

## *Comprehensive Belief System*

The requirement that a belief system be comprehensive helps to ensure that we do not extend the claim of religion to cover a set of isolated, unconnected ideas. This might be restated as a claim to an Aultimate and comprehensive >truth.=@ *See Malnak*, 592 F.2d at 209. It is not enough to show that an individual-s actions are based on deeply held convictions as manifested in their daily lives; rather our analysis should inquire as to whether those convictions are based on a uniform and articulable set of principles which lay a claim to universal application. The Comptroller points us to *Alvarado v. City of San Jose*, in which the court declared that New Age beliefs have no religious significance because Athere is no text, creed, or organized group@ involved. 94 F.3d 1223, 1225 (9th Cir. 1996).

By contrast, Ethical Culture has a developed body of literature and a set of principles. As the Ethical Union posits, AWe define ethics not simply and solely in terms of what is right or wrong, but in the larger sense of what is good and what is true.@ Thus, according to the Ethical Union, any attempt to

reduce its principles to a specific creed would violate its adherents= ability to articulate truth and goodness through the practices of Ethical Culture. Some Ethical Culture documents include injunctions to Atreat each other as ends, not merely as means,@ that Aself-reflection and our social nature require us to shape a more humane world,@ and that Alife itself inspires religious response.@ Books and essays on Ethical Culture and its practice have been routinely published over the more than a century during which the movement has existed.

 Furthermore, beyond simply asserting the primacy of a particular narrow idea or assumption, Ethical Culture attempts to create a comprehensive response to the problems faced in life based on a common contemplative practice. While it is true that Ethical Culture congregations welcome leaders trained in other religious traditions, including priests and rabbis, such pluralism is not inconsistent with a wide religious viewpoint attempting to assimilate various opinions about religious faith. Other religious groups maintain an interest in collectivist or comparative religious observance without thereby jeopardizing their own religious status. In our review of their literature and beliefs, the Ethical Society appears to offer a set of beliefs intended to allow an individual to assess his own relationship to creation through the experience of human interaction and ethical inquiry.

More fundamentally, the Ethical Union sees the totality of this debate, in both writing and observance, as an attempt to arrive at an understanding of Ahumanity=s place in the universe.@ Ethical Culture is not merely a disassociated string of ethical commitments, but a commitment to a particular discipline of spiritual observation. The emphasis the Society places on what Adler described as the Areality producing functions of the mind@ focuses its members on deriving moral commitment from an understanding

**21**

of human psychological experience and offers an absolute, and universal, basis on which Ethical Society members are to structure their own lives.

*External Signs*

Because the absence of external signs of religious practice should not be considered dispositive of a group=s religious status, *see Malnak*, 592 F.2d at 209, the Comptroller declines to discuss the external factors which might indicate that Ethical Culture should, indeed, be considered a religion for First Amendment purposes. Such external signs, however, may still be useful in determining whether a group qualifies as a religion. *See id.* We agree with the Comptroller that a group=s external manifestation of religious practice is not necessarily sufficient, by itself, to confer religious status. However, when coupled with a belief system that is, at least arguably, concerned with ultimate questions and comprehensive in nature, such factors swing the balance towards considering a group to be a religion.

In ruling that organizations are not religions, courts often emphasize their lack of certain practices or characteristics. The organizations held not to be religions in the cases cited by the Comptroller have lacked many of the features that would have made them more akin to traditional religious practices. They have lacked life ceremonies, such as naming ceremonies and ceremonial marriage. *See Church of Pan*, 507 A.2d at 1363; *Church of the Chosen People*, 548 F. Supp. at 1253. They have lacked trained clergy. *Mason*, 851 F.2d 47*, 53*; *Church of the Chosen People*, 548 F. Supp. at 1253, *Ideal Life Church v. County of Washington*, 304 N.W.2d 308, 311 (Minn. 1981). Nor have they been able to demonstrate a coherent and uniform body of literature supporting and elaborating on their religious ideals. *See Mason*, 851 F.2d at 53; *Church of the Chosen People*, 548 F. Supp. at 1253; *Church of Pan*, 507

A.2d at 1363; *Ideal Life Church*, 304 N.W.2d at 311. Most importantly, some of these organizations have not even bothered to set up a separate corporate entity and have funneled their funds, which they claim to have been used for religious purposes, into the private accounts of individuals who have used that money almost exclusively for personal expenses. *E.g.*, *Church of the Chosen People*, 548 F. Supp. at 1253; *Ideal Life Church*, 304 N.W.2d at 311 (under state tax provisions, subdivision could not declare itself a religion in order to enjoy tax-exempt status).

By contrast, Ethical Culture has the marks of a traditional religious organization. Indeed, with a history dating back to 1876, Ethical Culture does appear to function in a way analogous to more established religious groups. It maintains a *bona fide* separate corporate existence. It possesses a coherent literature. Ethical Culture groups meet regularly, typically on Sundays, for services including ceremonial practices. Those services are led by a group of clergy, most of whom have been educated at theological institutes and seminaries. The same trained clergy perform life cycle rituals, including marriages and naming ceremonies. The services are supplemented with religious instruction for children. The Ethical Society of Austin has such meetings, coordinated by professional clergy, and meets regularly on Sundays. Taken together, these factors indicate to us a sincere attempt by the Ethical Society, and its sister groups, to undertake to provide the benefits of a traditional religion. In light of our understanding of the structure of Ethical Culture=s principles, these external indications of religious faith mark an important factor for determining whether the Ethical Society is a religion.

Organizations such as the Ethical Society are entitled under the First Amendment to a careful assessment of their claim to religious status. Such an assessment requires careful analysis of *all* the

factors we have discussed in this opinion. We do not conclude that the Comptroller may *never* consider whether an organization espouses a belief in a Supreme Being; such an inquiry may be instructive in evaluating the types of ideas espoused by a particular applicant group. Instead, we hold that belief in a supernatural reality must serve, at most, as part of a broader inquiry that investigates both an organization=s beliefs and the means by which those beliefs are put into action. Ethical Culture=s practices and beliefs, in our opinion, address ultimate concerns and present a comprehensive belief system. Without question, their practices and rituals constitute the external signs of a religion. In short, the Ethical Society manifests its spiritual beliefs through organized observance; we cannot say that this activity falls outside of the scope of the First Amendment=s protection, and we believe, therefore, that it must fall within the legislature=s intent in granting the tax exemptions in question. Having held that the Comptroller=s requirement that a group believe in a Supreme Being, applied as the *sole test* for determining the grant of religious tax exemptions, violates the First Amendment, we now hold that, under the *Malnak* analysis, Ethical Culture qualifies as a religion for First Amendment purposes.

## CONCLUSION

Because we understand the First Amendment to require a broader definition of what should be considered a religion than the simple Supreme Being litmus test offered by the Comptroller, and because we believe that under such an analysis Ethical Culture should be so considered, we affirm the trial court=s judgment.

Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed:   March 6, 2003