TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN


═══════════════
NO. 03-04-00173-CV
═══════════════


The Voice of the Cornerstone Church Corporation, Appellant

v.

Pizza Property Partners, David J. Miller, John W. Hoberman, John G. Farrar, Exxon
Mobil Corporation and ExxonMobil Oil Corporation, Appellees


═════════════════════════════════════════════════════════════════
FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
NO. GN001463, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING
═════════════════════════════════════════════════════════════════


O P I N I O N


                        In this appeal, we review a permanent injunction enforcing a restrictive covenant to
prohibit activities of a church located on the former site of the Austin petroleum “tank farm.” 
Although the backdrop of this appeal involves not only religious but also environmental concerns,
the issues properly preserved on appeal and within our power to consider are exclusively these: (1)
whether the church, as a purchaser charged with notice, is bound by a restrictive covenant on the
property; (2) whether the district court properly determined that the church’s use of the property
violated the restrictive covenant; and (3) whether the district court could constitutionally enforce a
facially neutral and nondiscriminatory restrictive covenant against a church, a proposition that Texas
courts have long accepted. Because the district court correctly resolved these issues, we affirm the
judgment. 
BACKGROUND
                        Because the restrictive covenant we consider in this case resulted from a settlement
agreement with the former Texas Water Commission concerning remediation of an industrial
brownfield, we begin with a brief introduction to the ongoing policy developments in that area of
environmental law. Industrial brownfields are abandoned, idled, or underused industrial and
commercial sites where expansion or redevelopment is complicated by real or perceived
environmental contamination that can add cost, time, or uncertainty to a redevelopment project. See
Frona M. Powell, Amending CERCLA to Encourage the Redevelopment of Brownfields: Issues,
Concerns, and Recommendations, 53 Was. U. J. Urb. & Contemp. Law 113, 113-14 (1998). The
federal government’s emphasis on permanent cleanup of brownfields to leave land available for
unrestricted use has gradually faded over time, as the costs and difficulties of achieving such a goal
became clear. See Jim Spinaastra, et al., Industrial Controls: Brownfields Superweapon or Ultimate
Trojan Horse?, 15 Nat. Resources & Env’t, 104, 104 (2000); see also Comprehensive
Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.A. §§ 9601-9675
(West 1995 & Supp. 2004). Among other reasons, this policy shift resulted from concerns of the
polluting parties over a requirement to pay the costs to clean their sites to levels safe for residential
use when those sites were likely to remain industrial for the foreseeable future. See Spinaastra,
supra, at 104. As a result, the federal government began to encourage the use of land and water-use
restrictions to control residential exposure so as to open up previously idle brownfields for industrial
redevelopment. See id.; see also Frona, supra, at 113-14. Failure to maintain land restrictions may
subject the polluter to liability under CERCLA or state environmental law. See Spinaastra, supra,
at 106. In 1999, Texas implemented rules to reflect this new approach to brownfield redevelopment. 
See 30 Tex. Admin. Code §§ 350.1-.135 (2004) (Texas Risk Reduction Program); see especially id.
§ 350.1 (“The program also sets reasonable response objectives that will protect human health and
the environment and preserve the active and productive use of land.”).
                        Before 1992, Mobil Oil, a predecessor to ExxonMobil Oil Corporation
(“ExxonMobil”),


 owned and operated an oil pipeline terminal that served as a bulk fuel storage and
transfer station on property near the intersection of Airport Boulevard and Springdale Road in east
Austin. Neighbors to the property complained about soil and groundwater contamination, resulting
in litigation before the Texas Water Commission, the predecessor agency to the Texas Commission
on Environmental Quality (the Commission). In April 1992, all parties to that litigation reached a
settlement, which the Commission memorialized in an agreed order. According to the order, the
Commission found documented soil and groundwater contamination on the property in violation of
state water-quality regulations. The Commission thus ordered Mobil Oil to submit a pollution
remediation plan with provisions for quarterly monitoring of the corrective measures.
                        Although the settlement agreement is not in the record before us, the parties do not
appear to dispute that Mobil Oil’s duties under the agreement necessitated that it impose a restrictive
covenant to prohibit uses that could create environmental risks before selling or transferring the
property. Thus, in 1997, Mobil Oil sold the property to Pizza Property Partners by special warranty
deed with the following restrictive covenant:
As part of the consideration for this conveyance, the Grantee [Pizza Property
Partners] for itself, its successors or permitted assigns, covenants and agrees that
from the date of this Deed the property shall be used for commercial/light industrial
purposes only and neither the property herein conveyed nor any part thereof shall at
any time be used for (1) the storage and sale of motor fuels; (2) for residential
purposes, healthcare facilities, daycare facilities, schools, playgrounds; (3) that
irrigation and drinking water wells shall be prohibited; and (4) that subsurface
structures, including without limitation basements and below ground parking but
excluding building foundations are prohibited. This covenant shall survive delivery
of the Deed and is to run with the land herein conveyed and a similar restrictive
covenant shall be inserted in any deed or lease or instrument conveying or demising
the property herein conveyed or any part thereof.
 
 
For its part, Mobil Oil agreed to continue remediation and monitoring of the property with respect
to the petroleum contamination it caused “to the extent required and in a manner approved by the
governmental authority exercising jurisdiction over the matter, whether federal, state or local, or its
designee.” Pizza Property Partners also released Mobil Oil from any liability “related to the
existence or migration of petroleum contamination which arose out of” Mobil Oil’s use of the
property. 
                        Pizza Property Partners and Mobil Oil filed with the Travis County Clerk several
other documents memorializing the restrictive covenant. First, they created a “Post-Closing Use
Restriction Agreement,” reiterating the promises made in the restrictive covenant filed with the
special warranty deed. Second, they executed an “Agreement for Access to Premises after Transfer
of Title,” in which Pizza Property Partners acknowledged that the property had or
 
may have been impacted by petroleum contamination and that Seller [Mobil Oil] is
or will be undertaking, with reasonable diligence, Corrective Action . . . with respect
to petroleum contamination caused by Seller’s use of the premises which occurred
or commenced occurring before closing, if and to the extent required and in the
manner approved by the governmental authority exercising jurisdiction over the
matter, whether federal, state or local, or its designee . . . .


The parties defined “corrective action” in the document as “active remediation, passive remediation,
investigation and/or monitoring of petroleum contamination.” Mobil Oil and Pizza Property Partners
then agreed that such corrective action would continue until the appropriate governmental authority
would advise Mobil Oil that corrective action had been “completed to that authority’s satisfaction”
or until such time that Mobil Oil would determine that the environmental condition of the property
satisfies regulatory requirements. As a result, Pizza Property Partners granted Mobil Oil access to
the property to engage in corrective action, agreed to cooperate in the filing of notices and deed
acknowledgments, and consented to bind itself and any subsequent purchaser of the property to
submit future construction plans to Mobil Oil to accommodate Mobil Oil’s corrective action. By its
express terms, the agreement indicates that the parties intended to make it binding on all successors-in-interest to the parties.
                        On January 26, 2000, Pizza Property Partners conveyed the property to the Voice of
the Cornerstone Church Corporation (“Cornerstone”) by warranty deed with vendor’s lien, subject
to “any and all restrictions, encumbrances, easements, covenants and conditions” as filed with the
Travis County Clerk. The deed did not further elaborate on the restrictive covenant or explicitly
refer to the instruments filed with the County Clerk.
                        Cornerstone is an incorporated religious group organized, according to its articles of
incorporation, “to preach the [G]ospel of the [K]ingdom.” Its primary expression of this function
is by engaging in religious worship. It was formed in 1995, although the congregation had been
informally holding services in members’ houses earlier. At the time of the deposition of Juan
Ramos, Cornerstone’s pastor, the church had approximately 75 members but no paid staff.
                        No party disputes the facts concerning Cornerstone’s use of the property. At the time
of purchase, the property contained several old industrial warehouses. Cornerstone converted the
largest of these buildings into a church sanctuary, removing walls to create a larger space. It also
constructed a small kitchen attached to the sanctuary to provide meals for its members on Sundays. 
It received permits from the City of Austin for those renovations. Cornerstone also created a
baptismal pool from one of the tank farm’s fuel storage tanks. It removed sand that had filled the
hole where the tank had been, mixed the sand with cement, and used the resulting concrete to form
the floor and walls of the baptismal pool in the excavated hole. It then tiled the concrete
circumference of the hole.


 Cornerstone did not seek Mobil Oil’s permission to engage in any of
these renovations or construction projects.
                        Worship services occur on the property at least four times each week, estimated by
Cornerstone to constitute seventeen percent of the property’s use. In a smaller building, Cornerstone
runs a printing press to provide financial support for the church; it otherwise does not generate a
profit. Ramos has also operated an appliance repair shop and retail store on the property to help pay
the monthly expenses of the congregation. There is also evidence that some church members have
stored inoperable cars on the property for short periods of time.
                        In 2000, after it learned of activity on the property, Mobil Oil contacted Cornerstone
to inform it of its belief that Cornerstone’s use violated the restrictive covenant. The parties were
unable to come to an agreement concerning permitted uses of the property, and, in 2001,
ExxonMobil sought to enjoin both Cornerstone’s use of the property for church purposes and any
further construction projects, alleging that Cornerstone’s activities constituted a breach of the
restrictive covenant, access agreement, and use-restriction agreement Mobil Oil signed with Pizza
Property Partners in 1997. ExxonMobil also sued various other parties, including Pizza Property
Partners and the real estate agent who arranged the conveyance of the property to Cornerstone. 
                        The parties filed cross-motions for summary judgment. In its motion, ExxonMobil
explicitly sought a permanent injunction enjoining Cornerstone from using the property “for church
services or activities related to the Church or anything else other than commercial or light industrial
purposes,” from using the baptismal pool, and from further violating the restrictive covenant, the
post-closing use agreement, and the access agreement. The district court granted ExxonMobil’s
motion without stating the grounds. 
                        Thereafter, Cornerstone, for the first time, filed a declaratory-judgment counterclaim
seeking cancellation or modification of the restrictive covenant based on changed circumstances or
ambiguity. It also sought a declaration that ExxonMobil was not entitled to enforce the covenant
because ExxonMobil had no legal or equitable interest in the enforcement. Cornerstone also added
various new affirmative defenses. ExxonMobil filed a second summary-judgment motion on the
grounds that Cornerstone’s counterclaim and affirmative defenses were procedurally barred or
otherwise foreclosed by the district court’s ruling on its first summary-judgment motion, that the
declaratory-judgment action was improper because it addressed issues already before the district
court, and that each of the affirmative defenses and the counterclaim failed on the merits. 
Cornerstone filed a cross-motion seeking summary judgment on its counterclaim. The district court
granted summary judgment for ExxonMobil without stating the grounds. 
                        After a jury trial on the pending claim between ExxonMobil and Pizza Property
Partners,


 the district court rendered a final judgment incorporating all its previous rulings, and in
section 9 of the order it permanently enjoined Cornerstone from “using the property . . . for church
services and related fellowship and worship activities or anything else other than commercial or light
industrial purposes” and from “using, in any way, the baptismal pool located on the Property.” The
district court also prohibited Cornerstone from violating the terms of the restrictive covenant, the
use-restriction agreement, and the agreement for access to premises. Finally, the district court
disallowed “any type of construction activity without first allowing [ExxonMobil] to review any such
construction plans to ensure that any such plans accommodate and facilitate the Corrective Action.” 
This appeal followed. 

DISCUSSION
                        Cornerstone’s issues on appeal can be grouped for discussion as follows: (1)
ExxonMobil lacked standing to seek enforcement of the restrictive covenant; (2) there is no evidence
that Cornerstone violated the “commercial/light industrial” limitation or any other provision of the
restrictive covenant; (3) the district court abused its discretion in refusing to cancel or modify the
restrictive covenant on the basis of changed circumstances, hardship, latent ambiguity, or equitable
estoppel; and (4) enforcement of the covenant, as interpreted, violates Cornerstone’s religious
freedoms. 

Standing to enforce the restrictive covenant
                        Cornerstone contends that ExxonMobil lacks standing to seek enforcement of the
restrictive covenant.


 We disagree.
                        The issue of standing is a legal question, which we review de novo. Texas Lottery
Comm’n v. Scientific Games Int’l, Inc., 99 S.W.3d 376, 380 (Tex. App.—Austin 2003, pet. denied).
Standing is a component of subject-matter jurisdiction and is therefore essential to a court’s power
to decide a case. Texas Ass’n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 444-45 (Tex. 1993);
Benker v. Texas Dep’t of Ins., 996 S.W.2d 328, 330 (Tex. App.—Austin 1999, no pet.).


 To
establish standing, one must show a justiciable interest by alleging an actual or imminent threat of
injury peculiar to one’s circumstances and not suffered by the public generally. Benker, 996 S.W.2d
at 330; see also Hunt v. Bass, 664 S.W.2d 323, 324 (Tex. 1984).
                        A “restrictive covenant” is a negative covenant that limits permissible uses of land. 
Restatement (Third) of Prop.: Servitudes § 1.3(3) (2000). The original grantor of the property is
entitled to enforce a restrictive covenant on that property. Eakens v. Garrison, 278 S.W.2d 510, 514
(Tex. Civ. App.—Amarillo 1955, writ ref’d n.r.e.); Pierson v. Canfield, 272 S.W. 231, 233 (Tex.
Civ. App.—Dallas 1925, no writ). A restrictive covenant can bind a successor to the burdened land
in two ways: as a covenant that runs with the land at law or as an equitable servitude.


 TX Far W.,
Ltd. v. Texas Invs. Mgmt., 127 S.W.3d 295, 302 (Tex. App.—Austin 2004, no pet.); Reagan Nat’l
Adver. of Austin, Inc. v. Capital Outdoors, Inc., 96 S.W.3d 490, 495 (Tex. App.—Austin 2002, pet.
granted, judgm’t vacated w.r.m.). In Texas, a covenant runs with the land when (1) it touches and
concerns the land; (2) it relates to a thing in existence or specifically binds the parties and their
assigns; (3) the original parties to the covenant intend it to run with the land; and (4) the successor
to the burden has notice. Inwood N. Homeowners’ Ass’n v. Harris, 736 S.W.2d 632, 635 (Tex.
1987); TX Far W., Ltd., 127 S.W.3d at 302; see also Westland Oil Dev. Corp. v. Gulf Oil Corp., 637
S.W.2d 903, 911 (Tex. 1982); Wayne Harwell Props. v. Pan Am. Logistics Ctr., 945 S.W.2d 216,
218 (Tex. App.—San Antonio 1997, writ denied); Panhandle & S.F. Ry. Co. v. Wiggins, 161 S.W.2d
501, 504-05 (Tex. Civ. App.—Amarillo 1942, writ ref’d w.o.m.). In addition to these fundamental
requirements, we are to construe a restrictive covenant liberally “to give effect to its purposes and
intent.” Tex. Prop. Code Ann. § 202.003(a) (West 1995). Finally, purchasers are charged with
notice of the terms of deeds that form an essential link in their chain of ownership. Cooksey v.
Sinder, 682 S.W.2d 252, 253 (Tex. 1984); Westland Oil, 637 S.W.2d at 908. A purchaser is also
charged with knowledge of the provisions and contents of other recorded instruments. Cooksey, 682
S.W.2d at 253; Musgrave v. Brookhaven Lake Prop. Owners Ass’n, 990 S.W.2d 386, 396 (Tex.
App.—Texarkana 1999, pet. denied); County Flood Control Dist. v. Glenbrook Patiohome Owners
Ass’n, 933 S.W.2d 570, 575 (Tex. App.—Houston [1st Dist.] 1996, writ denied). 
                        It is undisputed that ExxonMobil is Mobil Oil’s successor-in-interest and stands in
the shoes of the original grantor in this case. Thus, it may enforce the restrictive covenant because
we determine that the covenant runs with the land. See Eakens, 278 S.W.2d at 514; Pierson, 272
S.W. at 233. Pizza Property Partners and Mobil Oil were in privity of estate when the restrictive
covenant was created. The special warranty deed conveying the property from Mobil Oil to Pizza
Property Partners contained the terms of the covenant, which attempts to make the property unusable
for purposes other than commercial or light industrial uses. See Westland Oil, 637 S.W.2d at 911. 
The covenant burdens the property itself, and its terms make clear that Pizza Property Partners and
Mobil Oil intended for it to bind future owners of the property. The explicit terms of the covenant
also evidence the parties’ intention that it run with the land. Finally, the record indicates that the
special warranty deed with the restrictive covenant, the post-closing use restriction agreement, and
the agreement for access to premises after transfer of title were all properly recorded in Travis
County. Thus, Cornerstone is charged with notice of the deed’s terms and those of the other
agreements made between Pizza Property Partners and Mobil Oil. Accordingly, we find that this
restrictive covenant runs with the land and that ExxonMobil properly had standing to seek its
enforcement.
                        In response, Cornerstone argues that the restrictive covenant at issue in this case is
in the nature of an “easement in gross” and that ExxonMobil lacks standing to seek enforcement
because (1) it is not an adjacent landowner, (2) enforcement does not relate to a benefit to adjacent
land, and (3) ExxonMobil has no legitimate interest affected by the prohibited activities. 
Cornerstone appears to confuse easements in gross with easements appurtenant. When a restrictive
covenant relates to an easement across a servient estate, that covenant may be characterized as an
easement appurtenant. Bickler v. Bickler, 403 S.W.2d 354, 359 (Tex. 1966); Drye v. Eagle Rock
Ranch, Inc., 364 S.W.2d 196, 207 (Tex. 1963). An easement appurtenant generally takes the form
of a negative easement: the owner of the servient estate may not interfere with the right of the owner
of the dominant estate to use the servient estate for the purpose of the easement. See Bickler, 403
S.W.2d at 359; Drye, 364 S.W.2d at 207. In contrast, an easement in gross attaches to an individual
and is not dependent upon the existence of a dominant estate in land. Drye, 364 S.W.2d at 207. The
standard Cornerstone suggests for analyzing an easement in gross actually pertains to easements
appurtenant. That standard does not apply in this case because ExxonMobil’s rights do not attach
to a dominant estate. Instead, we will adhere to the well-settled principles for analyzing restrictive
covenants, as we have described above. We overrule Cornerstone’s challenge to ExxonMobil’s
standing. 

Interpretation of the restrictive covenant
                        Next, Cornerstone argues that the district court incorrectly interpreted the restrictive
covenant to bar its church activities because those activities are merely incidental to the commercial
use of the property, because the covenant does not specifically exclude church uses from appropriate
uses, and because the baptismal pool was created from “an already existing concrete hole” as
opposed to being a new subsurface structure prohibited by the covenant. We disagree.
                        The grant or refusal of a permanent injunction is ordinarily within the trial court’s
sound discretion. Texas Health Care Info. Council v. Seton Health Plan, Inc., 94 S.W.3d 841, 851
(Tex. App.—Austin 2002, pet. denied); South Tex. Coll. of Law v. Texas Higher Educ. Coordinating
Bd., 40 S.W.3d 130, 139 (Tex. App.—Austin 2000, pet. denied). A trial court “abuses its discretion
when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error
of law.” BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 801 (Tex. 2002) (quoting Johnson
v. Fourth Court of Appeals, 700 S.W.2d 916, 917 (Tex. 1985)). Because the court issued its
injunction as a result of cross-motions for summary judgment, we must also bear in mind the
summary-judgment standards of review when considering alleged error. See Texas Health Care Info.
Council, 94 S.W.3d at 851.
                        The standards for reviewing traditional summary judgments are well established: (1)
the movant has the burden of showing that no genuine issue of material fact exists and that it is
entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue
precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3)
every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in
its favor. Tex. R. Civ. P. 166a(c); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex.
1985). The function of summary judgment is not to deprive litigants of the right to trial by jury but
to eliminate patently unmeritorious claims and defenses. Swilley v. Hughes, 488 S.W.2d 64, 68
(Tex. 1972). Summary judgment will be affirmed on appeal if any ground asserted in the motion
for summary judgment is a valid ground for rendering summary judgment. Cincinnati Life Ins. Co.
v. Cates, 927 S.W.2d 623, 626 (Tex. 1996). Thus, a party moving for summary judgment must
conclusively prove all elements of its cause of action or defense as a matter of law. Tex. R. Civ. P.
166a(c); Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex. 1999); Walker v. Harris, 924
S.W.2d 375, 377 (Tex. 1996). When both sides have moved for summary judgment and one motion
is granted and one denied, we determine all questions presented and render the judgment the trial
court should have rendered. Lubbock County v. Trammel’s Lubbock Bail Bonds, 80 S.W.3d 580,
583 (Tex. 2002).
                        In construing a restrictive covenant, as in construing any written instrument, our first
duty is to seek the intention of the parties to give effect to their purposes. Wilmoth v. Wilcox, 734
S.W.2d 656, 658 (Tex. 1987). We will give words and phrases used in a covenant their commonly
accepted meaning. Id. at 657-58. A restrictive covenant may be enforced by injunction where a
distinct or substantial breach is shown, without regard to the amount of damages caused by the
breach. Guajardo v. Neece, 758 S.W.2d 696, 698 (Tex. App.—Fort Worth 1988, no writ); Shepler
v. Falk, 398 S.W.2d 151, 154 (Tex. Civ. App.—Austin 1965, writ ref’d n.r.e.); Protestant Episcopal
Church Council v. McKinney, 339 S.W.2d 400, 403 (Tex. Civ. App.—Eastland 1960, writ ref’d). 
In such cases, it is not necessary to show the existence of any particular amount of damages or to
show that the injury will be irreparable. Shepler, 398 S.W.2d at 154; McKinney, 339 S.W.2d at 403. 
At least when a covenant restricts the use of property to residential uses, additional uses may be
permitted if they are reasonably incidental to prescribed uses and of such nominal or inconsequential
breach of the covenants “as to be in substantial harmony with the purpose of the parties in the
making of the covenants.” McKinney, 339 S.W.2d at 404 (quoting Moore v. Stevens, 106 So. 901,
904 (Fla. 1925)). A court may interpret and apply provisions of a restrictive covenant on summary
judgment when no factual issues exist. See Crispin v. Paragon Homes, 888 S.W.2d 78, 80-81 (Tex.
App.—Houston 1994, no writ). Cornerstone has insisted that the interpretation of the restrictive
covenant here is purely one of law. 
                        Although the restrictive covenant does not, in so many words, prohibit worship
services or related church activities, it unequivocally prohibits any use of the property other than
“commercial/light industrial purposes.” Especially given the brownfield-redevelopment context in
which the covenant was created, it was not necessary for ExxonMobil to enumerate with precision
every conceivable non-commercial, non-industrial use for that limitation to be effective. Absent
some bar to enforcement, we are bound to give effect to the clear intent of the drafters. Wilmoth, 734
S.W.2d at 658. Significantly, Cornerstone does not contend that its worship services, baptisms, and
similar activities are within the sphere of “commercial/light industrial purposes” permitted under the
restrictive covenant.


 Instead, apparently conceding that these activities violate the covenant,
Cornerstone urges that church uses nonetheless do not constitute a “direct and substantial” breach
because they constitute only a small percentage of the property’s uses relative to its commercial
enterprises. 
                        Given Conerstone’s concession, we must conclude that the church uses are neither
nominal nor inconsequential to the permitted “commercial/light industrial” uses. See McKinney, 339
S.W.2d at 404 (quoting Moore v. Stevens, 106 So. at 904). Cornerstone is organized primarily for
religious purposes. All other activity on the property is conducted for the purposes of supporting the
church’s religious mission—the printing press functions to spread Cornerstone’s religious message,
and any money earned through the operation of the appliance repair shop is directed to cover
Cornerstone’s operating expenses. Church services may constitute only seventeen percent of the
time the property is used for activities; however, they form the fundamental core of Cornerstone’s
use of the property. The issue we must address here is not, of course, whether these sorts of religious
activities on property are generally permissible or desirable, but whether, on the record before us,
Cornerstone’s use of the property is a “distinct or substantial breach” of the restrictive covenant’s
requirement that the property be used solely for “commercial/light industrial” purposes. Our
resolution of this issue must rest not on any personal views regarding religious activities but on
Texas law. Applying these principles, we conclude that Cornerstone’s use of the property for church
purposes is a distinct or substantial breach of the terms of the restrictive covenant. 
                        Additionally, we reject Cornerstone’s characterization of the baptismal pool as “an
already existing concrete hole” that did not violate the restrictive covenant’s prohibition of
subsurface structures. In restrictive covenants, the word “structure” may be used in a broad sense
or in a restricted one. Stewart v. Welsh, 178 S.W.2d 506, 508 (Tex. 1944); De Nina v. Bammel
Forest Civic Club, Inc., 712 S.W.2d 195, 198 (Tex. App.—Houston [14th Dist.] 1987, no writ). The
broad definition of a structure is “any production or piece of work artificially built up, or composed
of parts joined together in some definite manner; any construction.” Stewart, 178 S.W.2d at 508. 
In a restricted sense, “structure” means “a building of any kind, chiefly a building of some size or
of magnificence; an edifice.” Id. Inclusion of a particular object within the term, or its exclusion
therefrom, usually depends upon the context and the purpose sought to be accomplished by the
provision of which the term is a part. De Nina, 712 S.W.2d at 198. 
                        With this framework in mind, we turn to the language employed in the restrictive
covenant: “subsurface structures, including without limitation basements and below ground parking
but excluding building foundations are prohibited.” Given the brownfield-redevelopment
background and the broad language of the covenant, we find that the parties intended the broad sense
of the definition to control. Thus, when considering the baptismal pool, we note that it originally
was a sand-filled, in-ground, abandoned petroleum tank. Cornerstone removed the sand from the
tank, mixed it with cement, and used the resulting concrete to build the walls and floor of the
baptismal pool, four-and-a-half feet deep.


 We conclude that the baptismal pool is a structure under
the meaning intended by the parties to the restrictive covenant. The pool may have been easier to
construct because Cornerstone only had to dig and remove sand, but that fact does not change its
nature as a structure. Cornerstone did not merely use a “hole” that already existed. In addition,
Cornerstone does not dispute that the pool is properly characterized as being “subsurface.” Thus,
the creation of the baptismal pool independently violated the restrictive covenant’s prohibition on
subsurface structures. 
                        We have found that Cornerstone’s church activities violated the restrictive covenant’s
“commercial/light industrial” use limitation of the property. We have also determined that the
construction of the baptismal pool violated the covenant’s prohibition on subsurface structures. We
overrule Cornerstone’s assertion that the district court erred in its interpretation of the restrictive
covenant. 

Enforcement of the restrictive covenant
                        Having properly interpreted the restrictive covenant to find that Cornerstone had
violated its terms, the district court was bound to give it effect unless Cornerstone raised a bar
against enforcement. See Cowling v. Colligan, 312 S.W.2d 943, 945 (Tex. 1958) (in equity, court
may refuse to enforce valid restrictive covenant if proper defense is raised). On appeal, Cornerstone
asserts that (1) the district court abused its discretion in refusing to cancel or modify the restrictive
covenant on the basis of changed circumstances, hardship, or latent ambiguity, and in rejecting its
claim of equitable estoppel; and (2) enforcement of the covenant would violate its religious
freedoms.

       Cancellation or modification
                        Before we can address an issue on appeal, we must adhere to certain bedrock
limitations on our judicial power: the issue must have first been raised and properly presented in the
trial court and then must actually be raised before us on appeal. Tex. R. App. P. 33.1(a); Tex. R.
App. P. 38.1(e), (g), (h). In at least two ways, Cornerstone failed to preserve its arguments regarding
changed circumstances, hardship, ambiguity or equitable estoppel. First, Cornerstone did not assert
its counterclaim for cancellation or modification until after the district court had granted
ExxonMobil’s first summary judgment motion, nor did Cornerstone assert any of its affirmative
defenses—other than religious freedom—as grounds for denying ExxonMobil’s first summary
judgment motion.


 See Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984) (affirmative
defense must be raised with some evidence to avoid summary judgment); Martin v. First Republic
Bank, Fort Worth, N.S., 799 S.W.2d 482, 488 (Tex. App.—Fort Worth 1990, writ denied)
(counterclaim for reformation or recision of contract obligations not properly filed after court has
enforced obligations on summary judgment). In this case, Cornerstone did not raise either its
affirmative defenses or its counterclaims until after the district court had already ordered
enforcement of the restrictive covenant. That summary-judgment order was a final order for the
issues concerning the enforceability of the covenant. See Martin, 799 S.W.2d at 488. Thus,
Cornerstone waived those claims on appeal.
                        Second, Cornerstone has failed to properly assert these arguments on appeal. After
Cornerstone filed its counterclaim, ExxonMobil sought a second summary judgment on grounds that
Cornerstone’s claim and affirmative defenses were procedurally barred or otherwise foreclosed by
the first summary judgment and that each failed on the merits. The district court granted this motion
without specifying the grounds. On appeal, although Cornerstone challenges this ruling by arguing
the merits of its counterclaim and some of its affirmative defenses, it does not challenge the ground
that its claims and defenses were procedurally barred by the first summary judgment. When an
appellant from a summary judgment does not successfully attack every possible ground upon which
the district court could have based its summary judgment, the summary judgment must be affirmed. 
Grace v. Colorito, 4 S.W.3d 765, 768 (Tex. App.—Austin 1999, pet. denied). We are thus required
to affirm the second summary judgment foreclosing Cornerstone’s counterclaim and affirmative
defenses. We overrule Cornerstone’s issue regarding changed circumstances, hardship, ambiguity,
and equitable estoppel. 

       Religious freedom
                        Finally, Cornerstone argues that enforcement of the restrictive covenant violates its
rights to religious freedom. As an initial matter, we note that Cornerstone’s argument here is a
narrow one. Cornerstone contends only that enforcing the restrictive covenant would violate its right
of religious freedom and expression under the Texas Constitution by prohibiting religious services
and meetings. See Tex. Const. art I, § 6. Article I, section 6 provides: 
 
All men have a natural and indefeasible right to worship Almighty God according to
the dictates of their own consciences. No man shall be compelled to attend, erect or
support any place of worship, or to maintain any ministry against his consent. No
human authority ought, in any case whatever, to control or interfere with the rights
of conscience in matters of religion, and no preference shall ever be given by law to
any religious society or mode of worship. But it shall be the duty of the Legislature
to pass such laws as may be necessary to protect equally every religious
denomination in the peaceable enjoyment of its own mode of public worship.
 
 
Id. Cornerstone also invokes section 5.026 of the property code. See Tex. Prop. Code Ann. § 5.026
(West 2003). However, it does not present any argument concerning that provision separate from
its constitutional arguments. We will thus consider them as one argument based on the constitutional
principles. Finally, Cornerstone has invoked neither the federal constitution nor the Texas Religious
Freedom Act, which was enacted to provide greater protection for religious practices than the federal
constitution as currently interpreted. See U.S. Const. amend. I; Tex. Civ. Prac. & Rem. Code Ann.
§§ 110.001-.012 (West Supp. 2004-05); Employment Div., Dep’t of Human Res. of Ore. v. Smith,
494 U.S. 872, 885 (1990); City of Boerne v. Flores, 521 U.S. 507, 512, 529-36 (1997).


 
                        Because this dispute thus centers on a constitutional issue, we review the trial court’s
decision de novo. Strayhorn v. Ethical Soc’y of Austin, 110 S.W.3d 458, 463 (Tex. App.—Austin
2003, pet. denied); see also Perry v. Del Rio, 67 S.W.3d 85, 91 (Tex. 2001). Thus, we owe no
deference to the trial court’s decision and may proceed to resolve the issues presented as a matter
of law. Quick v. City of Austin, 7 S.W.3d 109, 116 (Tex. 1998).
                        We echo our sister court in Beaumont in expressing “our complete and wholehearted
adherence to and support of” the constitutional principle relied upon by Cornerstone, but we are
compelled to reject Cornerstone’s contention. See Ireland v. Bible Baptist Church, 480 S.W.2d 467,
471 (Tex. Civ. App.—Beaumont 1972, writ ref’d n.r.e.). Texas courts have routinely rejected the
notion that a facially neutral, otherwise valid restrictive covenant violates constitutional religious
freedom protections if applied against a church. See, e.g., Calvary Baptist Church v. Adams, 570
S.W.2d 469 (Tex. Civ. App.—Tyler 1978, no writ) (upholding temporary injunction that enjoined
church from violating residential-use-only restriction until final hearing); Ireland, 480 S.W.2d at
470-71; Protestant Episcopal Church Council v. McKinney, 339 S.W.2d 400 (Tex. Civ.
App.—Eastland 1960, writ ref’d) (affirming injunction against student gatherings and chapel
services when building also used as residence for priest); Calvary Temple v. Taylor, 288 S.W.2d 868
(Tex. Civ. App.—Galveston 1956, no writ) (halting construction of church on property restricted to
buildings for residential use only); Terrell Hills Baptist Church v. Pawel, 286 S.W.2d 204 (Tex. Civ.
App.—Austin 1956, no writ) (enjoining construction of church and school on property bound by
residential-use-only restrictive covenant); Chandler v. Darwin, 281 S.W.2d 363 (Tex. Civ.
App.—Dallas 1955, no writ) (restrictive covenant limiting construction to residential dwellings
interpreted to prohibit use of building for church services).


 In Ireland, for example, the Beaumont
court considered a restrictive covenant providing that no structure would be permitted on the
property except a detached single-family dwelling. Id. at 469. A church later built a sanctuary and
a smaller Sunday-school building on the property. Id. After a district court denied a request to order
the church to remove the buildings, the Beaumont court reversed and ordered the removal of the
buildings. Id. at 474.
                        In particular, the Ireland court rejected a claim that enforcing the covenant would
constitute unlawful discrimination under the Supreme Court’s decision in Shelly v. Kraemer, 334
U.S. 1 (1984). Id. at 470. In Shelly, the Supreme Court had barred judicial enforcement of a
restrictive covenant that limited occupation of the property to persons of “the Caucasian race” and
restricted occupation of the property from residential use “by people of the Negro or Mongolian
Race.” Shelly, 334 U.S. at 10. Such a covenant could not be enforced, the Court decided, because
it constituted “discriminatory action on the part of the States based on considerations of race or
color.” Id. at 23. As the Beaumont court correctly noted, the constitutional problem with the Shelly
covenant emerged from its discrimination between people based on their race. Ireland, 480 S.W.2d
at 470. Thus, Shelly might bar a restriction on religious uses of property if “the restriction applied
only to Baptist churches while permitting those of other denominations.” See id. Because the
restriction applied equally to churches of all denominations and faiths, the Ireland court determined
that it did not unlawfully discriminate against the church. Id.
                        Likewise, the restriction to be enforced here applies equally to the religious activities
of all denominations and faiths. Hence, no discrimination claim can be made under Texas
constitutional principles. See id. Accordingly, enforcement of the covenant does not violate the
Texas Constitution.
CONCLUSION
                        We have overruled Cornerstone’s arguments that ExxonMobil lacked standing to seek
enforcement of the restrictive covenant in this case, that the district court improperly interpreted that
covenant and that the enforcement of the restrictive covenant violates Cornerstone’s religious
freedom rights under the Texas Constitution. No other bars to enforcing the restrictive covenant or
the district court’s injunction have been advanced or preserved. Accordingly, we affirm the
judgment of the district court. 
 
 
                                                                        __________________________________________
                                                                        Bob Pemberton, Justice
Before Chief Justice Law, Justices B. A. Smith and Pemberton
Affirmed
Filed: March 10, 2005